HANNAH BRENNER ET AL. *v.* CLARENCE M. PLITT

[No. 25, October Term, 1943.]

*Decided December 14, 1943.*

The cause was argued before SLOAN, C. J., DELA-PLAINE, COLLINS, MARBURY, GRASON, MELVIN, ADAMS, and BAILEY, JJ.

*Michael J. Manley*, with whom were *Daniel Ellison* and *William B. Jacobson* on the brief, for the appellants.

*William L. Rawls* and *Louis M. Silberstein*, with whom were *Silberstein & Gorfine* on the brief, for the appellee.

BAILEY, J., delivered the opinion of the Court.

This is an appeal by Hannah Brenner and Fannie M. Pehr from a decree of the Circuit Court of Baltimore City, passed on January 18, 1943. By said decree the clerk of said court was directed to make the following distribution of the fund deposited with him under a decree of interpleader, passed on October 4, 1941, upon a bill of complaint of Home Life Insurance Company against Clarence M. Plitt and others, including the appellants:

First. To pay the courts costs.

Second. To pay to Clarence M. Plitt the sum of $5,-210.65, in full and final payment of the unpaid balance of a mortgage and note of May 19, 1939.

Third. To pay to William L. Rawls and Louis M. Silberstein, counsel for Plitt, the sum of $521.06 as counsel fee, under the provision of the note of May 19, 1939.

Fourth. To pay the balance, in equal shares, to Hannah Brenner and to Fannie M. Pehr.

The money paid into court under the decree of interpleader represented the proceeds of two life insurance policies issued by Home Life Insurance Company on the life of Joseph Brenner, in which policies Hannah Brenner was named as beneficiary. The policies had been assigned to Plitt as collateral security for the note of May 19, 1939, under circumstances hereinafter more fully explained.

The Brenner family consisted of the following: Joseph Brenner, Hannah Brenner, his wife, and Ethel Brenner,

Henry Brenner and Nathan Brenner, their children. On December 23, 1937, the Brenners executed a mortgage for $2,500 upon their home at 2302 Tioga Parkway, in Baltimore City. The mortgage was taken in the name of Edward Azrael, but it is admitted that the money was advanced by Plitt. The sum actually advanced to the Brenners was $1,920. The difference of $580, after the payment of the recording expenses, was divided between Azrael and Plitt, the evidence being vague as to the amounts received by each. The mortgage note provided for payments in installments on the principal, and interest at the rate of 6 per centum. In determining the total amount due from the Brenners to Plitt on May 19, 1939, the amount due on the mortgage was fixed at $235.25, but in arriving at this figure interest at the rate of 6 per centum was calculated upon the face amount of the note and mortgage, $2,500, rather than upon the sum of $1,920 actually received by the Brenners.

Joseph Brenner and his son, Nathan Brenner, were co-partners, trading as Joseph Brenner & Son, in the scrap iron and junk business. Commencing on April 30, 1938, with a loan from Plitt in the amount of $500, there were many transactions between Plitt and this firm, involving almost daily loans from Plitt in various amounts, until May 17, 1939. In the course of their business, the firm had opportunities to buy certain scrap and junk for cash, but, not having the necessary funds available, the money was borrowed from Plitt, with the understanding that when the merchandise was sold, the money advanced by Plitt was to be repaid to him, together with an additional amount for the use of the money. Plitt contends that these various deals constituted joint ventures, and that he was to receive a certain percentage of the profits for the use of the money advanced by him. But he testifies that Brenner, meaning the father, personally guaranteed the repayment of the loans and that he, Plitt, was to be repaid in full, even if the particular transaction resulted in a loss rather than a profit. The evidence offered by the appellants shows that what Plitt

received for the use of his money was an arbitrary amount, designated by Plitt, upon the receipt of the proceeds of the various sales, without regard to the profit that may have been made on the particular transaction. The bookkeeper for the Brenners testifies that she made all entries on the books in accordance with instructions given her by Plitt and that the money repaid to him, in excess of the money loaned or advanced by him, was entered on the books in a column headed "Commission."

There were other personal loans to Joseph Brenner for personal and household expenses, and upon their repayment Plitt was likewise paid a commission in excess of the legal rate of 6 per centum. On May 19, 1939, the amount due to Plitt on the loans to Joseph Brenner & Son and on the personal loans to Joseph Brenner was the sum of $9,729.35, but in making this calculation no credit was given to the Brenners for the amount of "commissions" paid, in excess of interest at the legal rate.

Joseph Brenner had five policies of insurance on his life, in the total face amount of $21,000, in four of which policies his wife, Hannah Brenner, was designated the beneficiary and in the fifth, the beneficiaries were his wife and three children. Brenner had borrowed on said policies and was paying interest on the loan at the rate of 6 per centum. This insurance loan was refinanced for Brenner by Plitt, and the five policies were assigned by Brenner to Plitt as security for the loan, with interest at 3 per centum. This transaction was carried on the Brenner books as a separate item, and the balance due thereon on May 19, 1939, was $10,378.92.

Another transaction between the parties involved the purchase of certain assets of Geiser Manufacturing Company, of Waynesboro, Pennsylvania. The sum of $3,100 advanced by Plitt in this matter was carried on the Brenner books as a separate item, upon which no interest was paid, and was taken into consideration in figuring the total amount of the indebtedness on May 19, 1939. While a considerable part of the record is

concerned with this item, the facts in connection therewith are not material to the decision of the issues involved in the instant case. Many of the facts are detailed in the opinion of this court in the case of *Berg v. Plitt*, 178 Md. 155, 12 A. 2d 609, 13 A. 2d 364.

The other principal item taken into consideration in arriving at the amount of the note and mortgage of May 19, 1939, was the sum of $1,125, owed by Joseph Brenner & Son to Plitt and secured by a chattel mortgage on a motor-driven shear. There is no dispute about this item.

Some time in May, 1939, Plitt decided to discontinue loaning or advancing money to Joseph Brenner & Son and to Joseph Brenner, individually, and at his suggestion and request, all the Brenners, on May 19, 1939, executed to Plitt a mortgage and collateral note, payable thirty days after date, in the amount of $24,-459.93. This amount represented the total indebtedness from the Brenners to Plitt as of that date, and included the balance due on the Azrael mortgage, the running account of the loans to Joseph Brenner & Son and to Joseph Brenner, individually, the insurance loan, the money involved in the Geiser Manufacturing Company transaction, and the chattel mortgage on the shear, with a slight adjustment of interest. The mortgage was a lien on the Brenner home at 3202 Tioga Parkway, all the household furniture therein, a 1935 White automobile truck and the motor-driven shear. The five life insurance policies, in the face amount of $21,000, were assigned to Plitt as collateral security for the note, which bore interest at the rate of 6 per centum.

Thereafter no further advances were made by Plitt, except certain fees in connection with the Geiser Manufacturing Company transaction, about which there is no dispute, but the indebtedness was credited by him with payments received from time to time from the sales of merchandise by the Brenners and with disability payments made under certain of the insurance policies.

Joseph Brenner died on January 17, 1940. A dispute then arose between the surviving Brenners and Plitt as

to the correct amount due him on the indebtedness of May 19, 1939, and there was an agreement between the parties that Plitt should proceed with the collection of three of the life insurance policies and apply the proceeds thereof as a credit on the indebtedness, but that the amount due on the two policies of Home Life Insurance Company was not to be collected by him until final agreement among them as to the correct amount due to Plitt, and that, upon their failure to reach such an agreement, the proceeds of the two policies, in the approximate amount of $7,000, were to be paid into court, under bill of interpleader, and distributed in accordance with the decree of the court. The only items disputed by the Brenners were the balance on the Azrael mortgage of $235.25 and the running account of $9,729.35.

In the meantime, in settlement of a suit which had been instituted in the Superior Court of Baltimore City by Fannie M. Pehr against the Brenners, the Brenners assigned to her an undivided one-half interest in and to the claim or claims of every kind, character and description which they had against Plitt or Home Life Insurance Company.

When the Brenners and Plitt failed to agree upon the correct amount of the indebtedness, Home Life Insurance Company filed its bill of complaint asking that the parties interplead. The decree of interpleader was passed on October 4, 1941, directing Home Life Insurance Company to pay into court the sum of $7,115.36, representing the proceeds of the two life insurance policies, after the deduction of court costs to date and a counsel fee of $350 to its solicitors. The decree further provided that the defendants interplead and that Hannah Brenner, Nathan Brenner, Ethel Brenner, Henry Brenner and Fannie M. Pehr be designated the plaintiffs and Clarence M. Plitt and Union Trust Company of Maryland, 'the defendants. The designated plaintiffs filed their bill of complaint, which was fully answered by Plitt. Union Trust Company of Maryland filed an answer in which it disclaimed any interest in

the policies or the proceeds therefrom. Testimony was taken in open court before the chancellor and it is from his decree that this appeal is taken.

In addition to the preliminary question as to whether any of the transactions between Plitt and Joseph Brenner & Son were joint ventures, the appeal presents for our determination three questions, namely:

First: Are the Brenners barred from showing the usurious character of any of the transactions, by reason of the provisions of Section 6 of Article 49 of the Code, 1939?

Second: Are they estopped to question the amount of the indebtedness as of May 19, 1939, because of the execution of the note and mortgage as of that date?

Third: Are the solicitors for Plitt entitled to counsel fee out of the fund, under the provisions of the note of May 19, 1939?

To constitute a "joint venture" or "joint adventure," as it is sometimes called, it is not sufficient that parties share in profits and losses, but they must intend to be associated as partners, either as general partners, or merely for the duration of the joint adventure. *Hutchinson v. Birdsong*, 207 N. Y. S. 273, 275. Mere agreement to share in profits, of itself, constitutes neither a partnership nor a joint adventure. *Palmer v. Maney*, 45 Idaho 731, 266 P. 424, 428. It has been held that a "joint adventure" exists when two or more persons combine in joint business enterprise for their mutual benefit with the understanding that they are to share in profits or losses and that each is to have voice in its management. *Chisholm v. Gilmer*, 81 F. 2d 120, 124.

The relationship between Joseph Brenner & Son and Plitt lacks all of the necessary elements to constitute any of the transactions between them joint ventures. Plitt admits in his testimony that under no circumstances was he to suffer any loss, and his testimony fails to disclose any voice that he had in the management of the affairs of Joseph Brenner & Son or any part that he took in the business or the sale of the merchandise.

In its most favorable light, his testimony is to the effect that he participated in the profits, in some manner determined by him alone. This is insufficient to constitute such transactions joint ventures, and we must conclude, as did the chancellor, that these transactions were definitely loans of money, and that interest was charged thereon at more than 6 per centum per annum. The fact that the payments to Plitt were designated upon the firm's books as "commissions" does not change their usurious character.

It is likewise, our conclusion that the Azrael mortgage is tainted with usury. The deduction of the $580 and the return of an undetermined portion of it to Plitt by Azreal creates a situation closely analogous to the one presented to this court in the case of *Glass v. Building & Loan Association,* 156 Md. 26, 143 A. 587. In that case it was held that where the owner of property, in order to make a sale to one without means, procured from a building association a mortgage loan to the purchaser of $3,400, which was $675 in excess of the cash price of the property, and this excess was immediately returned to the building association as a bonus for making the loan, but thereafter the association collected in the regular way from the purchaser on the basis of a loan of $3,400, the bonus was paid by the purchaser and not by the seller and that consequently the usury therein could be asserted by the purchaser against the building association.

The charging of such a commission by the lender has been branded as usurious by this court in the cases of *Real Estate Trustee v. Lentz,* 153 Md. 624, 139 A. 351; *Carozza v. Federal Finance Company,* 149 Md. 223, 131 A. 332, 43 A. L. R. 1, and *Brown v. Real Estate Investment Co.,* 134 Md. 493, 107 A. 196.

Usury is a moral taint wherever it exists and no subterfuge shall be permitted to conceal it from the eye of the law. In *Andrews v. Poe,* 30 Md. 485, it is said that "it matters not in what part of the transaction it may lurk, or what form it may take—whether it reads

6 per cent. upon its face, with an understanding to pay an extra 4 per cent., or whether it be a pretended sale and lease, or under whatever guise the lender—always fruitful in expedients—may attempts to evade the law, Courts of justice, disregarding the shadow and looking to the substance, will ascertain what in truth was the contract between the parties." This case was decided in 1869, prior to the passage of Chapter 358 of the Acts of 1876, now codified as Section 6 of Article 49 of the Code of 1939, but the court in the case of *Woods v. Matchett*, 47 Md. 390, decided in 1877, says: "It is well settled in this State that a Court of equity will grant relief against the payment of usurious interest, even after judgment, and further than this, that an action at law would lie prior to the Act of 1876, to recover excessive interest actually paid. *Hitch v. Fenby*, 6 Md. 218; *West v. Beanes*, 3 Har. & J. 568; *Goldsmith's Adm'r v. Tilly*, 1 Har. & J. 361; *Scott v. Leary*, 34 Md. 389; *Bandel v. Isaac*, 13 Md. 202."

Sections 1 to 5, inclusive of Article 49, of the Code of 1939, appeared in the Code of Public General Laws, 1860, as Article 95, Sections 1 to 5, inclusive, and Chapter 359, of the Acts of 1876, amended said Article 95, by adding an additional section thereto, numbered 6, and reading as follows: "6. Provided, however, that nothing in the preceding sections of this article shall be so construed as to make usury a cause of action in any case where the bond, bill obligatory, promissory note, bill of exchange, or other evidence of indebtedness, has been redeemed or settled for by the obligor or obligors, in money or other valuable consideration, except that of a renewal in whole or in part of the original indebtedness, but this section shall not apply in any cases of claims or suits now instituted by assignees in bankruptcy."

In the Code of Public General Laws of Maryland, 1888, Article 95 appears as Article 49, and Section 6 reads therein as above, with the following changes: the words "Provided, however, that," at the beginning of the sec-

tion, and the clause "but this section shall not apply to any cases of claims or suits now instituted by assignees in bankruptcy," are omitted.

By Chapter 74, Acts of 1888, it is provided that the Code of Public General Laws of this State, as prepared by John Prentiss Poe, and the Code of Public Local Laws, prepared by him, "be and the same are hereby respectively approved, adopted and declared to be the Code of Public General Laws and Code of Public Local Laws of this State, respectively, in lieu of and as a substitute for all Public General Laws and Public Local Laws of this State in force on the first Wednesday of January, in the year eighteen hundred and eighty-eight."

The next change in the wording of Section 6, of Article 49, was effected by the enactment of Chapter 835 of the Acts of 1912, which repealed Sections 6 and 7 of Article 49 and re-enacted the same with amendments. This Act struck out the words "except that of a renewal in whole or in part of the original indebtedness," and inserted in lieu thereof the following: "except that usury shall be a cause of action in all cases where the redemption or settlement above mentioned is secured by or connected with a renewal in whole or in part of the original indebtedness, provided that such original indebtedness shall not have exceeded the sum of $500." Certain changes were made in Section 7, with which we are not concerned. At the same time, the Legislature passed Chapter 836 of the Acts of 1912, adding three new sections to Article 56, title "Licenses," sub-title "Brokers," to be known as Sections 21A, 21B and 21C, defining and regulating the business of petty loan brokers. The amendments to Sections 6 and 7 of Article 49 were made to bring those sections in line with its scheme for the control of the matter of petty loans, which by Chapter 836 were defined as loans of $500 or less, secured by chattel mortgage or bill of sale.

By Chapter 88 of the Acts of 1918, the Legislature adopted the Uniform Small Loan Law. The title of this Act is as follows: "An Act to license and regulate the

business of making loans in sums of three hundred dollars ($300) or less, at a greater rate of interest than six (6) per centum per annum; prohibiting false or misleading statements with regard to loans in amounts of three hundred ($300) dollars or less; prescribing the maximum rate of interest and charge therefor and the penalties for violation of this Act; regulating the assignment of wages or salaries, earned or to be earned, when given as security for any such loans, prescribing certain duties of the bank commissioner; repealing Chapters 835 and 836 of the Acts of 1912, Bagby's Annotated Code, Article 49, Section 7, and Article 56, Sections 21-A to 21-C, inclusive; and all other Acts and parts of Acts inconsistent with the provisions of this Act."

Section 21 of Chapter 88, Acts of 1918, reads as follows: "Chapters 835 and 836 of the Acts of 1912, Bagby's Annotated Code, Article 49, Section 7, and Article 56, Sections 21A to 21C, inclusive, and all Acts inconsistent with the provisions of this Act are hereby repealed."

Chapter 88 was subsequently codified as Article 58A, "Loans—Petty," in Bagby's Annotated Code of Public General Laws, 1924.

By the express terms of this Act, as shown by the language used in the title and in Section 21 thereof, there can be no doubt that Chapter 835 of the Acts of 1912, which repealed and re-enacted with amendments both Sections 6 and 7 of Article 49, was repealed in its entirety. Nor can there be any doubt, that by said Act, Section 7 of Article 49 was stricken from the Code. But what was the effect of Chapter 88, Acts of 1918, upon Section 6 of Article 49, which had been amended by said Chapter 835 of the Acts of 1912?

It is a common-law rule of statutory construction that when a repealing statute is itself repealed the first statute is revived, without any formal words for that purpose, in the absence of a contrary intention expressly declared or necessarily to be implied from the enact-

ment of provisions conflicting with those of the law which would otherwise be revived; and it matters not whether the repeal in either case be by express language or by implication. 36 *Cyc., Statutes,* page 1099; 59 *C. J., Statutes,* page 941; 25 *R. C. L., Statutes,* page 932. This rule was expressly approved by this court in the case of *Applestein v. Baltimore,* 156 Md. 40, 53, 143 A. 666. By Chapter 88, Acts of 1918 the Legislature was establishing a comprehensive scheme for the regulation and control of petty loans and the provisions of said law were intended by it to be the law of the State in lieu of the provisions of law affecting petty loans, which had been enacted by Chapters 835 and 836 of the Acts of 1912. Must not its intention then have been to restore Section 6 of Article 49 to the form in which it stood prior to the enactment of Chapter 835 of the Acts of 1912? We are of the opinion that this intention is necessarily to be implied from the very language employed in both the title and body of the repealing statute. It follows, as a matter of course, that Section 6 of Article 49, as it appears in Flack's Annotated Code of 1939, and as it appears in Bagby's Annotated Code of 1924, is an incorrect statement of the statute law of this State and that the said section should actually read as follows, in the very language in which it appeared in the Code of 1888: "Nothing in the preceding sections of this article shall be so construed as to make usury a cause of action in any case where the bond, bill obligatory, promissory note, bill of exchange, or other evidence of indebtedness, has been redeemed or settled for by the obligor or obligors, in money or other valuable consideration, except that of a renewal in whole or in part of the original indebtedness."

Nor does the fact that the section, in its incorrect form, has been included in the Codes of 1924 and 1939 change our conclusion in this matter. Chapter 219, Acts of 1924, legalizing the Code of 1924 and making it evidence of the law, does not employ the language used in Chapter 74, Acts of 1888, enacting the Code of 1888,

which has already been quoted herein, but states only "That the Annotated Code of Maryland, edition of 1924, edited by George P. Bagby, be and the same is hereby legalized and shall be deemed and taken in all the courts of the State, and by all the Justices of the Peace of the State, and by all public officials of the State, to be evidence of the Public General Laws of the State contained in the Code of Public General Laws of Maryland of 1888 and the Public General Laws enacted subsequent thereto." Similar language is employed in Chapter 418, Acts of 1939, legalizing the Annotated Code of Maryland, Edition of 1939, edited by Horace E. Flack, and making it evidence of law. There is a vast difference in providing that the Code shall be "deemed and taken * * * to be evidence" of the law and in providing that the Code is "approved, adopted and declared to be" the law, "in lieu of and as a substitute for all" existing laws in force as of a certain date.

The effect of Chapter 74, Acts of 1888, was considered by this court in the case of *McDonagh v. Matthews-Howard Co.*, 160 Md. 264, 153 A. 47, and it was there held that, because of the nature of said Act, a statute appearing in the Code of 1888 was effective although it was not the codification of a pre-existing statute. But in the case of *De Murguiondo v. Frazier*, 63 Md. 94, dealing with the adoption of the Revised Code of 1878, this court has said: "By adopting the Revised Code as a convenient compilation of the statute law, and making it evidence of what the law is, the Legislature has not made any change in the law existing at the time of its adoption as such compilation; and in so far as it erroneously states the law as it is found in the Code or the statutes adopted since, the Code and the statutes remain the best evidence of what the law is, and the Revised Code of 1878 must yield, to them respectively, when in conflict with them."

The Code referred to in the above quotation is the Code of Public General Laws of 1860, which by Chapter 1, Acts of 1860, was adopted in lieu of and as a substitute

for all the Public General Laws theretofore passed by the Legislature of Maryland.

The same rule is applicable to the Codes of 1924 and 1939, with respect to the proper wording of Section 6 of Article 49, and the inclusion of improper language, language which had in fact been repealed, in said codes, as a part of said Section 6, cannot change or amend the existing statute law of the State of Maryland.

There have been a number of decisons of this court construing this section of the code. In *Second German-American Building Association v. Newman,* 50 Md. 62, at page 66, the court has said:

"It has been decided in *Scott v. Leary,* 34 Md. 389, that a party who has paid usury, was entitled to recover it back in an action at law; and the same decision was made in *Williard v. Baltimore Butchers' Loan & Annuity Ass'n,* 45 Md. 546.

"The intent of the Act of 1876 was to change the law in this respect, and to take away such right of action, in cases where the transaction has been closed and finally settled by the parties, and the debt has been paid and satisfied."

In the case of *Border State Building Association v. Hayes,* 61 Md. 597, at page 600, in referring to Chapter 358, Acts of 1876, the court says:

"It is the intention of that law that when a usurious contract is entirely paid, and the whole transaction closed between the parties, then no cause of action shall lie against the usurer. But the Act is equally explicit in declaring that it means a real and *bona fide,* and not a sham payment or settlement. It says in effect, that although the original bond, note, or other evidence of debt may be paid, yet if it be paid with money obtained from the creditor for that purpose, that Act shall not apply. Such a payment is a mere renewal of the debt. It makes no difference whether the renewal is for the whole, or for only part of the debt; either comes within the exception engrafted in the statute. The debtor may pay five-sixths of the debt, and renew his note or obli-

gation for the other sixth part, but as long as that other sixth part remains unpaid, the debtor has the right of action to recover back all the usurious interest he has paid on the whole debt.

"The case before us has every ear-mark of a renewal, and comes within the exception of the Act of 1876. The appellee was indebted to the appellant corporation upon a mortgage. He executed another mortgage to the same appellant corporation, and applied a part of the money that he received on the last mentioned mortgage in discharge of the first. This makes this second mortgage transaction a part of the first, as clearly as the branch that springs from the trunk is a part of the tree.

"The original transaction is not closed and settled, and the appellee has therefore the right to a rebate of all the usurious interest he has paid on the original mortgage."

The opinion of this court in the case of *Border State Building Association v. Hilleary*, 68 Md. 52, 11 A. 505, is to the same effect.

We have quoted at length from the opinion in the case *of Border State Building Association v. Hayes, supra,* because of the similarity between the facts of that case and the case at bar. We shall not prolong this opinion by repeating the facts of the instant case. We are of the opinion that this case comes clearly "within the exception engrafted in the statute," as it is admitted that the mortgage and note of May 10, 1939, were given by the Brenners to Plitt in renewal in whole or in part of the Azrael mortgage and of the running account, both of which were usurious, and that Section 6 of Article 49 does not operate as a bar to prevent the Brenners from showing the usurious character of these transactions in these proceedings and from collecting the usurious interest so paid from the funds under control of the court.

This brings us to the question of estoppel. Equitable estoppel, as defined by Pomeroy in his *Equity Jurisprudence,* 4th Ed., Vol 2, Sec. 804, "is the effect of the

voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed, either of property, or contract or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract or of remedy." This definition of equitable estoppel has been adopted by this court in the following cases: *Rodgers v. John,* 131 Md. 455, 102 A. 549; *Pearre v. Grossnickle,* 139 Md. 1, 114 A. 725; *Benson v. Borden,* 174 Md. 202, 198 A. 419; *Rody v. Doyle,* 181 Md. 195, 29 A. 2d 290.

In order for the doctrine of equitable estoppel to be invoked against the appellants we must find from the evidence that Plitt has been led by some conduct of the appellants to change his position for the worse. It is urged by Plitt that his acceptance of the mortgage and note of May 19, 1939, from the Brenners meets this condition, because thereby he postponed for thirty days any action that he might institute against them on an overdue indebtedness. But the note contains a power to confess judgment thereon at any time after maturity. A large part of the Brenner indebtedness was an open account, upon which suit could only have been instituted in assumpsit, with all of the delays incident to the trial of a suit at law. And Plitt's condition was changed for the better rather than for the worse in many other ways by reason of the execution of the papers on May 19, 1939. Prior to that time, the home at 2302 Tioga Parkway stood as security for only $235.25, the balance due on the Azrael mortgage; the five life insurance policies in the face amount of $21,000 secured only the insurance loan for $10,378.92; the motor-driven shear was encumbered only by the chattel mortgage for $1,125; Plitt had no lien on the household furniture and the White truck; and the running account in the amount of $9,729.35 was unsecured. Thereafter the whole indebtedness was secured by all of the property, real and per-

sonal, mentioned above; in fact, by all of the property, real and personal, owned by the Brenners, and in addition the whole loan bore interest at 6 per centum, whereas the insurance loan had previously been at 3 per centum. A mere recital of the above facts demonstrates the absurdity of Plitt's claim that by the acceptance of the mortgage and note of May 19, 1939, he has been placed in a worse position than that occupied by him prior thereto. This case lacks all the elements essential to invoke the doctrine of equitable estoppel against the appellants.

The note of May 19, 1939, contains the following provision: "The undersigned further authorize the holder upon or after the non-payment of this note or the interest thereon, of any of said debts, obligations, claims or demands when due, or upon or after failure to furnish collateral as hereinbefore agreed, to collect, foreclose, realize upon, compromise, release, renew, extend or exchange, (either in the name of the holder or of the undersigned), or to sell the whole or any part of the collateral or substitutes or additions thereto, at any Broker's Board or at public or private sale at the option of the holder, without notice of intention to sell or of intention to collect, foreclose or realize upon said collateral or of the time or place of sale thereof and without demand of payment of this note or interest thereon, or of any of said debts, obligations, claims or demands and after deducting all expenses, including 10% attorney's fees, arising from or incidental to the collection, foreclosure, realization or sale of any of said collateral, substitutions or additions or of any of said debts, obligations, claims or demands, including this note and interest thereon, and including any repayments hereinafter referred to, and as agent of the undersigned, to apply the residue of the proceeds to pay any and all of said debts, obligations, claims, or demands, in whole or in part, due or not due, including this note and interest thereon, making such application in such manner and ways as the holder may see fit, and making rebate of in-

terest upon debts, obligations, claims or demands not matured by their terms."

Another provision of the note, with which we are not here concerned, authorized the entry of judgment by confession thereon, with 10 per cent. attorney's fees and costs.

There is no question that a stipulation in a promissory note in case of its non-payment at maturity, to pay the costs of collecting the same, including attorney's fees, is valid and can be enforced. *Bowie v. Hall,* 69 Md. 433, 16 A. 64; *Gaither v. Tolson,* 84 Md. 637, 36 A. 449; *Webster v. People's Loan, Etc., Bank,* 160 Md. 57, 152 A. 815; 7 *Am. Jur., Bills and Notes,* Sec. 138, p. 865; 10 *C. J. S., Bills and Notes,* Sec. 108a, p. 565.

In *Maus v. McKellip,* 38 Md. 231, in considering a mortgage wherein the mortgagor covenanted to pay the mortgage debt and "all counsel fees and costs that the said John Maus may be put unto in collecting the debt aforesaid, or in releasing this mortgage," the court held that a fee or commission paid the attorney for collecting the mortgage debt came within the terms of the mortgage and was properly allowed.

In *Gaither v. Tolson, supra,* it was held that, under a mortgage containing a similar covenant as to attorney's fees, such a fee was payable to an attorney in whose hands the mortgage was placed for foreclosure, in addition to the commissions paid under another covenant of the mortgage to the trustee who conducted the foreclosure sale, and that it made no difference that the attorney and the trustee were the same person.

In discussing the inclusion of attorney's fees in judgments entered by confession, upon notes authorizing such inclusion, Judge Sloan, in the case of *Webster v. People's Loan, Etc., Bank, supra,* 160 Md. at page 63, 152 A. at page 817, says: "The commission entered is not a gratuity to which the attorney is entitled upon the entry of his appearance for the plaintiff, but is payable for services rendered as the judgment is collected, and at the rate or in the proporitions stated in the contract or or-

der of court. *Johnson v. Phillips*, 143 Md. 16, 25, 122 A. 7."

We feel that the terms of the provision of the note, quoted herein, are broad enough to come within the decisions above referred to, and that the attorneys for Plitt have performed such services "arising from or incidental to the collection" of the debt due by the Brenners to Plitt as to entitle them to the attorney's fees provided for in said note, in connection with the collection thereof. The amount of the attorney's fee will, of course, be determined by the amount ultimately found to be due on the note of May 19, 1939, from the Brenners to Plitt.

For the reasons assigned in this opinion the decree of January 18, 1943, must be reversed. It appears from the record that no evidence has been produced in connection with many items of the running account, but that only sufficient evidence was offered to show the usurious nature of some of the transactions. The true and correct amount due from the Brenners to Plitt cannot be determined until evidence has been produced showing the nature of all the items included in the running account. The case will, therefore, be remanded for the production of such testimony and, thereafter, for the entry of a decree in conformity with this opinion. The costs in the lower court are properly payable out of the fund, but we feel that the costs of this appeal should be paid by the appellee.

> *Decree reversed and case remanded for further proceedings and passage of a decree to conform with this opinion, the costs below to be paid out of the fund in court and the costs here to be paid by the appellee.*