UNITED STATES of America, for the Use and Benefit of GULFPORT PIPING COMPANY, Plaintiff,

v.

MONACO AND SON, INC., Durant Insulated Pipe Company, Inc.

and

Hartford Accident and Indemnity Company, Defendants.

Civ. A. No. 12996.

United States District Court
D. Maryland.

Sept. 24, 1963.

Monaco was the successful bidder on the contract, and the work to be performed under the contract was divided into five categories: (1) concrete, (2) excavation, trenching and backfilling, (3) heat distribution system, (4) storm drains, and (5) waterproofing. Prior to its bid, Monaco had obtained from Durant a quotation for furnishing certain of the materials required for the heat distribution system and, indeed, had obtained some assistance from Durant in preparing its bid. About three weeks after Monaco was notified by the Corps of Engineers to proceed, it issued a purchase order to Durant to "furnish all underground conduit, accessories and necessary fittings for a complete installation as required by the project plans and specifications and all addenda," as required by the contract. Durant, in turn, gave a purchase order to Associated Piping and Engineering Company, Inc. (hereafter called "Associated") to furnish materials and fabricate the heat distribution system. The materials were sold to Durant f. o. b. Gulfport, Mississippi, and were to be shipped to Monaco at Andrews Field. Durant was to be billed in accordance with a letter agreement between Durant and Associated. It may be noted that deliveries were not billed on a monthly basis, as contemplated by the letter agreement. On or about December 31, 1959, Associated, which had partially performed the contract, sold its physical assets to the use plaintiff Gulfport, to which was assigned Durant's purchase order to Associated and which completed performance of the contract.

R. Carleton Sharretts, Jr., Baltimore, Md., Dan H. Shell, Kenneth G. Perry, Satterfield, Shell, Williams & Buford, Jackson, Miss., for plaintiff Gulfport.

Kahl K. Spriggs, Chevy Chase, Md., for defendant Monaco.

John E. Smeltz, Cleveland, Ohio, for Durant.

Charles C. Hartman, Jr., Annapolis, Md., for Hartford.

WINTER, District Judge:

In this suit, brought under the Miller Act, 40 U.S.C.A. § 270a *et seq.*, Gulfport Piping Company (hereafter called "Gulfport") is the use plaintiff. Named as defendants are Monaco and Son, Inc. (hereafter called "Monaco"), Durant Insulated Pipe Company, Inc. (hereafter called "Durant"), and Hartford Accident and Indemnity Company (hereafter called "Hartford"), the corporate surety on the Miller Act bond provided by Monaco after the award to it of a contract for the construction and completion of a steam distribution system at Andrews Air Force Base, located in the State of Maryland. The contract was awarded, on June 30, 1959, through the United States Corps of Engineers. On July 13, 1959 Monaco was given notice to proceed.

Monaco made payments to Durant from time to time, beginning October 27, 1959, other than in accordance with the letter agreement, but Durant did not make payment to Gulfport. This suit ensued. Gulfport's theory of the case is that Durant was a subcontractor to Monaco, the prime contractor, and Gulfport as a supplier to a subcontractor is entitled to the protection of a Miller Act bond, MacEvoy Co. v. United States, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944). Monaco and Hartford contend that Dur-

ant was a supplier to Monaco, and Gulfport a supplier to a supplier; hence, Gulfport is beyond the scope of protection of a Miller Act bond, MacEvoy Co. v. United States, *supra*. Even if Durant be determined to be a subcontractor to Monaco, Monaco and Hartford contend that Gulfport is barred from recovery by estoppel and principles of the law of agency applicable to undisclosed principals. The latter contention is that Durant acted as agent for Gulfport, the undisclosed principal, so that payment to Durant constituted full discharge of Monaco's obligations, if any, to Gulfport. If, in fact and in law, Durant was a subcontractor, Monaco and Hartford make no contention that Gulfport has not fully complied with the procedural requirements of the Miller Act as to notice, time of notice and sufficiency of notice.

As a result of the initial complaint, Hartford filed a cross claim against Monaco, based on the provisions of an indemnity agreement between them entered into in connection with the giving of the bond praying a judgment over if it be held liable to Gulfport. Linked to its defense that Durant was an agent for the undisclosed principal, Gulfport, Monaco filed a counterclaim against Gulfport to recover damages for various alleged defaults of Durant in the performance of its contract. Other causes of action and cross claims were also filed, but, by stipulation, settled prior to the trial.

With regard to the main issue in the original suit, the leading case on the question of the scope of protection of the Miller Act, and bonds given in compliance with the Act, is MacEvoy Co. v. United States, *supra*, and that case undertakes to define what is a subcontractor. In that case the court pointed out (322 U.S. p. 108, 64 S.Ct. p. 894, 88 L.Ed. 1163) "In a broad, generic sense a subcontractor includes anyone who has a contract to furnish labor or material to the prime contractor," but after considering the state of the law prior to the enactment of the Miller Act and the legislative history of the Miller Act the court concluded that the word "subcon-

tractor" as used in the Miller Act was used (322 U.S. p. 110, 64 S.Ct. p. 895, 88 L.Ed. 1163) " * * * in its technical sense so as to exclude materialmen and laborers." The court defined the technical meaning of the word "subcontractor" as (322 U.S. p. 109, 64 S.Ct. pp. 894-895, 88 L.Ed. 1163) " * * * one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen." Coupled with this definition, the court admonished the lower courts (322 U.S. p. 107, 64 S.Ct. p. 893, 88 L.Ed. 1163) "The Miller Act * * * is highly remedial in nature. It is entitled to a liberal construction *and application* in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects. * * * But such a salutary policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds." (emphasis supplied)

Like so many cases of this type, factually, its precise counterpart is not to be found among the decided cases, and not all of the facts as disclosed by the evidence point unerringly to the conclusion that Durant either was or was not a subcontractor to Monaco. I find the following facts to support the conclusion that Durant was a subcontractor to Monaco:

1—Subject to basic design by the Corps of Engineers and the specifications of the contract, and with supervision and approval of the Corps of Engineers, the entire responsibility for the precise design, fabrication and installation of the heating distribution system was vested in Monaco. Under the prime contract, Monaco was obligated to furnish shop drawings of the system. Monaco did not prepare these shop drawings. It acted as a conduit in transmitting them to and from the Corps of Engineers, but the responsibility of preparing them was delegated to and carried out by Durant. In addition, Durant was required to make certain engineering calculations in

connection with the system, including return look stress calculations, anchor details, gauge of steel bands, and thickness of end casings. The design of expansion loops was another responsibility placed on Monaco by the prime contract and, thus, delegated to and performed by Durant. In the preparation of shop drawings Durant did more than simply copy the basic government drawings. It was required to determine the component parts of the system, and its ultimate concept of the system included the use of 328 different pieces of insulated piping, 101 of which were unique, in that its counterpart was not found elsewhere in the system.

2—Monaco, when it issued a purchase order to Durant, did not undertake to specify the component parts of the system. Rather, it issued a general direction to "furnish all underground conduit, accessories and necessary fittings for a complete installation as required by the project plans and specifications and all addenda," and thus delegated to Durant the responsibility which Durant fully met to determine what items of conduit accessories and necessary fittings were required.

3—The agreement between Durant and Monaco required that Durant furnish and supervise installation of a custom-built prefabricated steam distribution system of a highly specialized nature. In fact, the system consists of an outer spiral weld piping of varying diameters up to twenty inches containing an inner pipe covered with fiber glass insulation, an annular air space and various supports and brackets. Historically, the type of work which Durant performed was performed at the installation site by pipe fitters. As field fabrication labor costs increased disproportionately to shop fabrication labor costs there was a movement within the industry to custom prefabricated systems of this type in a pipe fabricating shop. As a result, Durant, under its agreement with Monaco, took from Monaco a large portion of the cost of labor which formerly would have been performed in the field and performed

that labor in a pipe fabricating shop. Photographs of the system and an examination of the drawings and specifications clearly indicate that no matter the source from where the system was obtained it would have had to be specially fabricated for this particular job.

4—An analysis of original contract costs gives a good indication of the quantum of the work required under the contract which was performed by Durant. The contract price by and between Monaco and the Corps of Engineers was $193,-800.00. As previously indicated, this contract included five categories of work: (1) concrete, (2) excavation, trenching and backfilling, (3) *heat distribution system*, (4) storm drains, and (5) waterproofing. The purchase order from Monaco to Durant for the heat distribution system portion of the contract which Durant was to furnish was in the amount of $89,680.00, an amount slightly in excess of 40% of the entire contract price.

5—While the contract relationship between Monaco and Durant was cast in the form of a purchase order, pursuant to the purchase order and accompanying letter agreements, Durant furnished supervisors to supervise the installation and testing of the system. Durant carried out the supervision of the installation and testing of the system and, in fact, its supervisory representatives were on the job site approximately 80% of the time during which work was in progress. Thus, Durant furnished to Monaco considerably more than just materials, or even customized materials. It furnished the expert and skilled supervisory labor which Monaco's performance of the prime contract required.

6—As performance of the prime contract was under way, a dispute occurred between the Corps of Engineers, Monaco and Durant over the galvanizing specifications of the prime contract. The Corps of Engineers maintained that the specifications required the entire heat distribution system after assembly to be hot-dipped galvanized so that a zinc coating would be applied over the welds. Durant and Monaco maintained that it

was impossible to hot-dip galvanize the entire system after it was fabricated, inasmuch as the insulation in the inner core of the pipe would be destroyed by such a process. Various meetings between the parties were held, and representatives of Durant participated on an equal footing with representatives of Monaco. In fact, after November 23, 1959 the discussions and negotiations concerning this problem were primarily carried on between the Corps of Engineers and Durant. Indeed, in reference to this problem Monaco, by letter dated November 17, 1960, wrote to the Corps of Engineers and once described Durant as "our subcontractor" and "the subcontractor."

Ultimately, the dispute was settled, when the Corps of Engineers required Durant to perform additional work on the system other than hot-dip galvanization. Included in this additional work was the application of epoxy resin coating to field welds. The Corps of Engineers required a ten-year guarantee to correct field welds should it prove that the epoxy resin coating gave less protection than the hot-dipped galvanization which the Corps of Engineers initially required. This guarantee was given by Durant and accepted by the Corps of Engineers from Durant, notwithstanding that the prime contract provided a one-year guarantee from Monaco.

As opposed to these facts, I find the following facts which point to the conclusion that Durant was not a subcontractor to Monaco:

1—The prime contract required Monaco to submit to the Corps of Engineers for approval the name of the manufacturer-supplier of the conduit along with the names of suppliers for certain other items to be furnished in the prosecution of the work. As is usual in government contracts, payrolls of employees of subcontractors were required to be submitted periodically to the Corps of Engineers. In purported compliance with these contract provisions, Monaco submitted Durant for approval as the manufacturer-supplier of the conduit. Durant was not submitted for approval as a subcontractor, although Monaco, after having initially advised the Corps of Engineers it did not contemplate the use of any subcontractors, did submit the names of other concerns doing other work as subcontractors. Monaco's contractual relationship to these other concerns was cast in the form of a purchase order, like its relationship with Durant. None of Durant's payrolls were ever submitted to the Corps of Engineers.

2—Although Durant provided the supervisory personnel and know-how for installation of the system, Monaco provided the gross labor for installing the system after its customized components had been delivered to the job site.

3—Except with respect to later negotiations and correspondence in regard to the dispute about hot-dipped galvanization of field welds, when representatives of Durant corresponded directly with the Corps of Engineers, all correspondence and communication between Durant and the Corps of Engineers was through Monaco, including submission of drawings, test data, laboratory reports, and the like.

4—After Gulfport gave first notice to Monaco under the Miller Act of its intention to assert a claim for nonpayment, Gulfport made inquiry of the Corps of Engineers as to whether it considered Durant as a subcontractor, or as merely a material supplier to the prime contractor. In response, the Chief, Construction Division of the Washington District, Corps of Engineers, telegraphed Gulfport that Durant " * * * is considered a material supplier to Monaco * * *."

5—The president of Monaco, John Francis Monaco, and the secretary-treasurer of Monaco, Nicholas Chacos, both expressed the opinion that Durant was a material supplier and not a subcontractor. The testimony of Mr. Gerald R. Kruse, the Chief of the Construction Division of the Washington District, Corps of Engineers, was proffered that Durant was considered a material supplier and not a subcontractor. Mr. Kruse was the same person who had answered Gulfport's request for information in the

same manner, after Gulfport had first given notice of its claim under the Miller Act. The testimony of Mr. Kruse, being merely cumulative to the documentary proof which he presented, was not received.

The definition of "subcontractor" fixed by the *MacEvoy* case is an empirical one. This Court has specifically said that substance, not form, controls, United States v. Ft. George G. Meade, Etc., 186 F.Supp. 639, 652 (D.C.Md.1960). See also St. Paul-Mercury Indemnity Company v. United States, 238 F.2d 917 (10 Cir., 1956); Ryan v. Bethlehem Sparrows Point Shipyard, 209 F.2d 53 (4 Cir., 1953). Thus, in weighing the facts stated above, what transpired and how the prime contract was actually performed is what is important and what controls, and not the labels the parties attached to their relationship or the extent to which they brought themselves into formal compliance with the prime contract as to certifications of status, certifications of payrolls, and time and manner of payment.

I put aside as relatively insignificant the fact that Monaco described Durant as "our subcontractor" and "the subcontractor," as well as the statement by the Corps of Engineers that Durant was considered a material supplier to Monaco. Likewise of little significance is the fact that Durant was not submitted for approval as a subcontractor, and that Durant's payrolls were not certified and submitted periodically to the Corps of Engineers as the prime contract required of the payrolls of subcontractors. That the contract relationship between Monaco and Durant was cast in the form of a purchase order is not determinative in any case, but particularly so not here, because the evidence disclosed that, even where Monaco's relationship to another was admittedly one of a prime contractor and subcontractor, it formalized its relationship no differently from the purchase order which it issued to Durant.

The opinion evidence of Messrs. Monaco and Chacos and the proffered testimony of Mr. Kruse, even if accepted, is entitled to little weight. While the opinion of one versed in the industry is many times helpful, it must be scanned closely for interest in the outcome, and it can never be permitted to serve as a substitute for a determination by the Court of the legal conclusion that a given party was or was not a subcontractor, United States v. Wright Contracting Company, 194 F.Supp. 444, 448 (D.C. Md.1961). Messrs. Monaco and Chacos manifestly have a direct interest in the outcome of the litigation, but, more importantly, the facts on which their opinions were based were all in evidence. Mr. Kruse's proffered testimony was merely cumulative, since his opinion, as expressed to Gulfport, was in evidence, but, significantly enough, even though prepared to repeat this opinion, Mr. Kruse admitted that it was not usual for a material supplier to have supervisory representatives on the project, such as was done here, and, further, his opinion was based primarily upon consultation of the list of subcontractors furnished by the general contractor, he having no experience in the construction industry, other than procedures followed by the Corps of Engineers throughout the country.

The ultimate determination in the case depends upon a consideration of the extent to which, in matters of substance, Monaco delegated to Durant, and Durant undertook to perform for Monaco, "a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen," MacEvoy Co. v. United States, *supra*.

Viewed only from the standpoint of cost, Monaco delegated a substantial portion of its responsibility under the prime contract to Durant. Of course, in many contracts the cost of materials may well exceed the cost of labor, so that it does not necessarily follow that because the cost of materials is a substantial portion of the total cost of the prime contract the material supplier is thus converted into a subcontractor. But here the materials were not in any sense standard ma-

terials but, rather, were customized for this particular project. Several courts have held that a supplier of prefabricated and customized materials, prepared in such condition that they are ready for immediate installation, is enough to render the supplier a subcontractor, even though the supplier does not have many services in reference to installation, United States v. John A. Johnson & Sons, 137 F.Supp. 562 (D.C.W.D.Pa.1955), Basich Bros. Const. Co. v. United States, 159 F.2d 182 (9 Cir., 1946). This view, however, has been rejected by this Court in United States v. Wright Contracting Company, *supra*, cf. United States v. Blount Brothers Construction Co., 168 F.Supp. 407 (D.C.Md.1958), but this case does not turn precisely on this point, because Durant did more than supply prefabricated materials.

The facts disclose that, insofar as installation was concerned, Durant performed very essential services. It is true that Durant did not perform the gross labor in placing pipes in ditches and joining them, but a large portion of the work which Durant did not perform could be performed by common laborers provided that they acted under the supervision which Durant did provide. Even before the matter of actual installation, the prime contract imposed on Monaco the obligation to translate specifications and general design prescribed by the Corps of Engineers into an actual working program, including drawings. This function was delegated to and performed by Durant. As the work progressed and the impossibility of the specifications that welds be hot-dipped galvanized was rendered apparent, the conclusion is inescapable that ultimate negotiation and ultimate solution of the dispute which ensued was delegated to Durant and carried out by Durant, not only in the negotiations leading up to solution, but the guarantee on which the solution was predicated. If a special guarantee were to be required, it would seem axiomatic that the guarantee would be required of Monaco, which, under the prime contract, had given a general guarantee, but, in fact, the guarantee was given by Durant and the Corps of Engineers, notwithstanding that it did not consider Durant a subcontractor within the formal requirements of the prime contract, was willing to accept and rely on it.

Monaco and Durant rely heavily on United States v. Wright Contracting Company, *supra*, and Ryan v. Bethlehem Sparrows Point Shipyard, *supra*. As to the former, their reliance is understandable, particularly since they were successful counsel in that case and many of its facts were quite similar to the case at bar. But in the case at bar there was: (a) in prefabrication and preinstallation planning and engineering a far greater delegation of the prime contractor's prime contract responsibility to Durant, (b) supervision of installation and testing and negotiation, and (c) negotiation, settlement and guarantee of a dispute as to materials and solution of the dispute, so that I do not consider the holding in the *Wright Contracting Company* case either applicable or in conflict with my conclusion that, here, Durant was a subcontractor within the meaning of the Miller Act. As to the *Bethlehem Sparrows Point Shipyard* case, it was decided under the Maryland Workmen's Compensation Act. The Court specifically noted (209 F.2d p. 56) that its decision was confined to that Act and the activities considered might be concluded to be something different in a Miller Act case. Even so, the factors which serve to distinguish this case from the *Wright Contracting Company* case serve to distinguish it from the *Bethlehem Sparrows Point Shipyard* case.

Concluding as I do that Durant was a subcontractor, I must next consider the other two defenses of Monaco and Hartford.

To understand the defense of estoppel, additional facts must be stated. As has been recited, after Durant received the purchase order from Monaco it gave a purchase order to Associated to furnish and fabricate the materials to be shipped f. o. b. Gulfport to Andrews Field. The conduit was fabricated at the Associated

plant at Gulfport, Mississippi. The first deliveries were made in the fall of 1959 to Monaco. Associated then sold its physical assets to Gulfport, on or about December 31, 1959, and Durant's purchase order to Associated was assigned by Associated to Gulfport. Thereafter, Gulfport fabricated the conduit which was shipped to Monaco during March and April, 1960.

Gulfport's work order for the conduit instructed Gulfport's employees to show Durant as shipper of the material from Gulfport, Mississippi, to Andrews Field. Durant's letterhead, used in extensive correspondence with Monaco, represented that Durant had a factory at Gulfport, Mississippi. In fact, Durant never had a factory at Gulfport, Mississippi.

The uniform straight bills of lading for all the conduit delivered from Gulfport, Mississippi to Monaco showed Durant as the shipper, with its address at Gulfport, Mississippi, and these were prepared and signed by a Mr. K. A. Parent, who was an employee of Associated and later of Gulfport. In the regular course of business, Monaco received copies of the straight bills of lading. The shipping tickets or freight bills for the material all showed Durant to be the shipper. In the regular course of business, Monaco received copies of the shipping tickets, also.

Packing lists were prepared, showing the lengths of the pipe which were for the purpose of serving as a check list in ascertaining whether all materials had been furnished, and also to enable Monaco to know at what locations the pipe or conduit was to be unloaded. Such packing lists accompanied the trucks in which the materials were delivered, and the lists were received by Monaco in the usual course of business. They bore the name of Durant and showed Durant as the shipper. Subsequent to the dispute in this case, Gulfport has required Durant to delete from its letterhead the representation that Durant had a factory at Gulfport, Mississippi.

Each section of pipe manufactured by Gulfport bore a union label, and that label showed that Durant was not the manufacturer. Representatives of Monaco, other than mere laborers, were on the job site, at least with respect to the doing of the work required by other phases of the prime contract, is self-evident from the evidence. On two occasions the label was seen by the president of Monaco, and I find that the labels (two were in use during the period in question) were of the nature, size and type that they were seen, or should have been seen, by any representative of Monaco on the job site who looked at any sections of pipe. Notwithstanding, Monaco, through its officers, claims that it did not know that Associated and, later, Gulfport, were the manufacturers of the pipe; rather, it thought that Durant was the manufacturer of the pipe and, in reliance on such knowledge, paid Durant the major part of the amounts owed by Monaco to Durant. There was testimony that if Monaco had known that Gulfport fabricated the pipe and would make claim for payment it would have declined to make payment to Durant.

In considering whether these facts support application of the doctrine of estoppel, I conclude that there was no misrepresentation that Durant was the shipper of the materials. Title thereto passed to Durant at Gulfport, Mississippi, so that, factually and legally, Durant was the shipper. However, it was not the manufacturer and that it thus falsely represented itself was undoubtedly known to, and acquiesced in by, Associated and Gulfport. That the union labels on the sections of pipe showed that Durant was not the manufacturer do not completely overcome this misrepresentation, because Monaco might have concluded that Gulfport was a supplier of ordinary pipe, fabricated by Durant in the special form required by the prime contract.

[4, 5] Even if Durant misrepresented the facts and Gulfport is chargeable with Durant's misrepresentation, estoppel is not a good defense "unless it is shown that these false statements have caused detriment to the contractor," Moyer v. United States, 206 F.2d 57, 60 (4 Cir.,

1953). It is in this essential element that Monaco's defense falls, because the evidence is quite clear Monaco treated Durant throughout as a material supplier and not as a subcontractor. I do not doubt that Monaco would not have paid Durant had the former known that Gulfport would assert its claim, but the evidence of the dealings between the parties does not support a finding that Monaco paid Durant because it was unaware of Gulfport. Rather, the evidence shows, and I so find, that, consistent with its assertion on the first and main issue that Durant was a material supplier, Monaco erroneously treated Durant as a supplier and not a contractor. This misconception on Monaco's part, in my view, was the principal reason why Monaco paid Durant without regard to whether any of Durant's suppliers, including Gulfport, had been paid, or their payment secured. Since Monaco's detriment is the result of its own act, estoppel is no defense.

■ If the evidence establishes that Durant was an agent for an undisclosed principal (Gulfport), or that Durant and Gulfport were joint venturers, payment to Durant would constitute payment to Gulfport, even though Durant did not remit to Gulfport, Boka Electrical Construction Co. v. W. M. Chappell, Inc., 104 U.S.App.D.C. 407, 262 F.2d 718 (1958); Restatement of the Law of Agency 2d, §§ 186 and 206. Moreover, Monaco would be entitled to recover from Gulfport for any defaults by Durant, Restatement, *supra*, §§ 306, 307.

■■ These legal doctrines have no application in this case because the evidence does not show that Durant was Gulfport's agent, or that Durant and Gulfport were joint venturers. The only evidence to that effect to which Monaco can point is a letter written to Durant by Associated under date of February 15, 1959, four months prior to the award of the prime contract, and approximately five months prior to the issuance of a purchase order from Monaco to Durant. The letter was in the nature of a quotation suggesting a splitting of profits after the recovery of the costs of manufacture and prefabrication in the event that Durant was awarded a contract by Monaco. There is no evidence that the letter was agreed to or became effective between the parties. The only evidence indicates that it did not. But, in any event, such an arrangement would not make the parties joint venturers, or the one agent for the other, because at most it suggests a profit splitting relationship. A splitting of profits, without provision for a sharing of losses, does not, of itself, establish a joint venture, St. Paul-Mercury Indemnity Company v. United States, 238 F.2d 917 (10 Cir., 1956); Brenner v. Plitt, 182 Md. 348, 34 A.2d 853 (1943). Monaco's defense in this regard is without merit, and Gulfport is entitled to judgment on Monaco's counterclaim grounded on this same theory.

One matter remains for decision, the amount of Gulfport's damages. Initially, Gulfport claimed $78,441.91, with interest from May 30, 1960, thirty days after Gulfport's last shipment to Durant. This amount was the sum of (a) $70,274.88 for materials furnished in accordance with Durant's purchase order to Associated, later assigned to Gulfport, and (b) $8,167.03 for the cost of galvanizing the pipe after the Corps of Engineers had been persuaded to accept the pipe in the site with ungalvanized welds under the settlement agreement, and had insisted that future deliveries of pipe be galvanized strictly in accordance with the specifications of the prime contract.

By stipulation, Gulfport's claim has been reduced by $18,571.43, which represents $^{78}\!/_{84}$ths of the amount which Gulfport received ($20,000.00) from the assignment to a third person of a portion of its claim against Durant. Gulfport's claim in this litigation is, therefore, a maximum of $59,870.48, with interest.

At the hearing, Gulfport showed that it furnished the materials to Durant which Durant ordered, that total billings amounted to $78,441.91, as before stated, and that the amounts billed represented fair and reasonable charges for the materials supplied. Monaco asserts that

Gulfport's claim should be reduced: (1) in the amount of $8,167.03, which represented the added costs to Gulfport of galvanizing in order to make the pipe precisely meet the specifications in the prime contract; (2) in the amount of $12,765.89, which represents the cost of the materials in excess of the contract price between Associated and Durant; and (3) in the amount of $39,220.38 for alleged losses caused Monaco by Gulfport's alleged delay in the performance of its contract with Durant. These claimed reductions will be considered seriatim.

There is no evidence that Durant specified to Associated, or to Gulfport, that the welded sections of pipe should be hot-dipped galvanized. Indeed, there was affirmative evidence that Durant's drawings furnished to Associated and Gulfport, from which they determined the materials to be furnished, did not reflect the need for galvanizing, and not until performance of the contract had begun did Durant require Gulfport to furnish pipe the welds of which were galvanized. Failure thus to comply with the specifications of the prime contract was not due to any default on the part of Associated or Gulfport. Notwithstanding that an allowance of the cost of strict compliance with the specifications of the prime contract would cause the contract price between Durant and Associated, and Gulfport, to be increased, there is no question but that the work was required, the cost of doing the work was fair and reasonable, the work went into the performance of the prime contract, and Gulfport is entitled to payment. It may well be that Monaco and Hartford have a claim over against Durant, but such a claim would not defeat Gulfport's right to recover under the Miller Act and bond, Fanderlik-Locke Cir., 1960); United States v. Williams, 240 F.2d 561 (10 Cir., 1957).

The evidence disclosed that the contract price between Durant and Associated was $73,414.00, and that for the portion of the contract performed by Associated, Associated billed and received the sum of $15,905.01. Gulfport seeks to recover, exclusive of the cost of galvanizing, the sum of $70,274.88. This amount, when added to what was paid to Associated, is $12,765.89 over and above the amount of the original contract price between Durant and Associated.

While these facts raise a strong suspicion that someone has been overpaid they are not enough, standing alone, to constitute a good defense to Gulfport's right to recover. The record shows that Gulfport billed only for materials actually supplied to Durant, that the materials billed were shipped to the Andrews Air Force job site, that they were billed, after shipment, and that they were billed strictly in accordance with the discount formula of 42%, less 10%, less 10%, from the agreed upon base price. Monaco did not show that the materials shipped and billed by Gulfport were not received at the job site, or were not billed in accordance with the original agreement between Durant and Associated, nor did it show that Associated billed for and received compensation in excess of the materials which it supplied. Even if the latter had been shown, under the thorities previously cited, such facts would not constitute a good defense to Gulfport's claim, because the relationship between Associated and Gulfport was a sale of assets and not a merger or consolidation, so that there is lacking the type of corporate continuity required to charge Gulfport with Associated's receipts. In short, Gulfport proved its claim and, there being no proof to the contrary, Gulfport is entitled to judgment for its claim.

Monaco's assertion that the claims against it should be reduced by losses caused by Gulfport's delays in performance, and Gulfport's furnishing defective materials, may be summarily disposed of, since there is a lack of evidence to show either.

Judgment against Monaco and Hartford will be entered for the use plaintiff, in the amount of $59,870.48, with interest from May 30, 1960; and judgment for Hartford against Monaco, in the same amount.