GORDON MCELHOSE, APPELLEE, v. UNIVERSAL SURETY CO., APPELLANT.

158 N. W. 2d 228

Filed March 29, 1968. No. 36767.

Sidner, Gunderson, Svoboda & Schilke, for appellant.

Roscoe L. Rice, Frank Roubicek, and George Johnson, for appellee.

Richard W. Smith, Richard L. Spangler, Jr., and Woods, Aitken & Aitken, for amicus curiae.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, and McCOWN, JJ.

CARTER, J.

This is an action by Gordon McElhose against Universal Surety Company to recover the rental due for the use of two caterpillar tractors under the provisions of a public works bond furnished by Universal. On a trial to the court, a jury having been waived, the trial court found for the plaintiff in the amount of $7,500 and costs, including an attorney's fee of $1,500. Universal has appealed to this court.

The evidence shows that from May to August 1965, Blacktop, Inc., was a general contractor with the State of Nebraska on a road construction project in Cedar County. The project undertaken by Blacktop was for the construction of the base, and the asphalt and concrete surfacing work to the shoulders of the road. Universal executed a public works contract bond as required by section 52-118, R. S. Supp., 1965, which in its overall effect is "* * * conditioned for the payment of all laborers and mechanics for labor that shall be performed and for the payment for material and equipment rental which is actually used or rented in the erecting, furnishing, or repairing of the public structure or improvement or in performing the contract."

In the spring of 1965, the Laurel Sand and Gravel Company, a trade name under which John Calcavechia operated as sole owner, entered into a written agreement to furnish Blacktop with about 33,424 yards of gravel in accordance with state specifications at the site of the road construction project at specified prices at a total cost of $92,708.50. This gravel was to be delivered

at the rate of 800 cubic yards per day for each working day as counted by the state. Calcavechia conducted his business at three different gravel pits which were 14, 16, and 28 miles from the project. He ordinarily sold gravel to anyone desiring the product. He testified that during the period of his contract with Blacktop he sold no gravel except rejected gravel other than a quantity sold to Dobson Brothers, another road contractor.

Calcavechia owned one caterpillar tractor which he found inadequate in fulfilling his contract with Blacktop. In May, Calcavechia rented a tractor from McElhose at a rental of $14 per hour. In June he rented a second tractor from McElhose at the same rental. Under the agreement, Calcavechia was to pay for the gas, oil, upkeep, and minor repairs. McElhose was to make all major repairs. Due to bad weather and breakdowns some question arose as to the amount of rental due McElhose which was amicably fixed in the total amount of $7,500. The furnishing of gravel was completed in August. McElhose estimated the completion date as August 15, 1965. The two rented tractors were used only at the gravel pits, a minimum of 14 miles from the road construction project. Neither of the rented tractors was ever at the site of the project.

On or about July 1, 1965, McElhose told Calcavechia he could use some money. He was told by Calcavechia that he had received no money from Blacktop who was waiting for money from the state in order to pay Calcavechia. About 3 weeks later, McElhose talked to L. R. Harpstreith, president of Blacktop, about being paid for the rental of his tractors. Harpstreith stated that not enough work had been done to submit an estimate. McElhose had a subsequent conversation with Ron Keefer, an officer of Blacktop, in which Keefer said when they got some money from the state for Calcavechia, they would see that he got his money; that he was not to worry. McElhose said he told Keefer he would pull the tractors off the job unless he got some money and Keefer said

not to do that as it would paralyze the operation; that they would see that he got his money. McElhose said he talked to Harpstreith after the job was completed. Harpstreith wanted a copy of the bill to use in settling with Calcavechia. On or about August 20, 1965, McElhose called at the gravel pit to make a final settlement with Calcavechia of the amount due. At this time, they agreed on the amount due as being $7,500. McElhose made up a final bill for the $7,500 and sent it to Calcavechia. He also sent a copy of the bill to Blacktop by registered mail which was receipted for on October 19, 1965. He never talked with a representative of Blacktop after sending it a copy of the bill by registered mail.

Armond Kuehn, project engineer for the state, testified that by virtue of his position he was required to supervise the work and see that all statutory requirements as to insurance, bonds, pay scales, and the like were met. He saw to it that Blacktop had insurance but not as to subcontractors who were not approved as such. He did not check Calcavechia in this respect as he considered him a supplier of materials and not a subcontractor within the meaning of the law. He testified he had no control over Calcavechia, that he had seen the tractors working in the gravel pits, but did not know that they were leased equipment. He said the rented tractors did no work on the job and, in fact, there were no such tractors used on the site of the project. Harpstreith testified that McElhose called him on the telephone in August and told him that Calcavechia owed him $7,500 in rentals which Harpstreith said he would pay if an assignment to McElhose was presented. He said McElhose called him later at a time when he had money belonging to Calcavechia available, that Calcavechia was contending he owed only $4,000 to McElhose, and that he would pay it over only on an assignment by Calcavechia, which was never produced. He said he told McElhose that Calcavechia was a supplier and not a subcontractor, that Blacktop was not

liable, and for that reason he would pay McElhose's claim only if an assignment from Calcavechia was presented. Harpstreith stated that he contracted for the gravel delivered on the job, that he had no control over Calcavechia, and that his only concern was that Calcavechia deliver the gravel on the job site pursuant to their agreement.

It was upon this evidence that the trial court found that Universal was liable on its bond for the payment of the tractor rentals in the amount of $7,500 and denied Universal's contention that Calcavechia was a supplier of materials to Blacktop without a right of recovery against Blacktop or its contract bondsman, Universal.

Insofar as applicable to the parties in this case, section 52-118, R. S. Supp., 1965, provides in part as follows: "It shall be the duty of the State of Nebraska, * * * empowered by law to enter into a contract for the erecting and furnishing, or the repairing of any * * * highway * * * to enter into such contract, to which the general provisions of the mechanics' lien laws do not apply, and where the mechanics and laborers have no lien to secure the payment of their wages and materialmen who furnish material and who lease equipment for such work have no lien to secure payment therefor, to take from the person * * * to whom the contract is awarded a bond, * * * conditioned for the payment of all laborers and mechanics for labor that shall be performed and for the payment for material and equipment rental which is actually used or rented in the erecting, furnishing, or repairing of the * * * improvement or in performing the contract."

It is not disputed that the gravel was used in the construction of the highway. The rental of the two caterpillar tractors was necessitated by plaintiff's contract to deliver the large quantities of gravel set forth therein. The evidence does not establish that the small quantities of gravel sold elsewhere than to Blacktop was not or could not have been provided by the cater-

pillar tractors owned by the plaintiff. Nor can it be questioned that the delivery of gravel under Calcavechia's contract with Blacktop was not subject to the general provisions of the mechanics' lien law. The evidence also shows that plaintiff notified Blacktop by registered mail of his claim for rentals in the amount of $7,500 for the use of the two caterpillar tractors in providing the gravel for use by Blacktop in performing its contract with the state. The question therefore resolves itself into one as to whether or not the rental of the caterpillar tractors is a contract with a subcontractor within the provisions of the statute, or whether or not the delivery of the gravel was the supplying of material, as defendant contends, and not within the contemplation of the statute.

In Kiewit Sons' Co. v. National Casualty Co., 142 Neb. 835, 8 N. W. 2d 192, a similar issue was involved. In that case, Roadmix Construction Company entered into a contract with the state to construct a road. The claims of the plaintiff against the bondsman of Roadmix were for obligations owed by Roadmix to plaintiff for rental charges for equipment supplied by plaintiff and used in carrying on the work of the contract and the cost of transportation of plaintiff's rental equipment to and from the job. In sustaining the claim, this court said: "The equipment furnished by plaintiff was not a part of the regular equipment of Roadmix, but a part of regular equipment ordinarily used by a contractor engaged in road construction. The use of this equipment, so rented and transported to and from the job as occasion required, under the supervision of plaintiff's engineer, contributed directly to the construction of the highway. The value of that use (and that is what rental is) is within the protection of, contemplated and intended by the statute and the bond and one not too remotely connected with the principal work. The rule adhered to in some jurisdictions, that the materials to be lienable must be incorporated into the structure or public work

for which the contract was executed under the circumstances here existent, is too narrow, under a liberal interpretation of the statute, as required. In fact, the machinery or equipment, placed on the job by plaintiff and rented by Roadmix, transported to and from the job as required, constituted material actually used in the construction and repair of the highway. * * *

"We conclude that the items sued for by plaintiff are recoverable under the statute and bond. Such items so furnished constitute labor and material purchased under an agreement of hire or lease, in that all that is purchased is consumed in aid of the contract, within the meaning of the second condition of the bond and of section 52-118, Comp. St. 1929, 'conditioned for the payment of all laborers and mechanics for labor that shall be performed and for the payment for material which is actually used * * * in performing the contract.' "

West v. Detroit Fidelity & Surety Co., 118 Neb. 544, 225 N. W. 673, was an action against the subcontractor to recover for labor and material furnished in the construction of a public highway. In this case contracts for the hauling of gravel were made with truckowners at a fixed price per mile. The contractor made arrangements with garagemen and mechanics to make repairs to these trucks upon orders from the contractor to whom they were to be charged. The contractor deducted the cost of repairs from the amount due for hauling. This court held "that the labor and materials used in making such repairs were 'supplies used or employed on said contract,' within the meaning of those terms, and chargeable to the surety."

The defendant attempts to differentiate between subcontractors and suppliers, but it is clear from the West case that the use of these general terms does not afford a basis for determining liability. A materialman or supplier can be a subcontractor. The written contract between Blacktop and Calcavechia for furnishing gravel according to specifications and for delivering it to the

project site in the quantity required points toward Calcavechia as a subcontractor and not a supplier as that term is used in its restricted meaning. See, Fremont Foundry & Machine Co. v. Saunders County, 136 Neb. 101, 285 N. W. 115; Nye-Schneider-Fowler Co. v. Roeser, 103 Neb. 614, 173 N. W. 605.

Defendant relies primarily on Concrete Steel Co. v. Rowles Co., 101 Neb. 400, 163 N. W. 323. In this case Rowles Co. was a general contractor with the county of Webster for the construction of a courthouse and gave a bond with National Surety Company as surety. Concrete Steel Co., at the request of the Julian S. Nolan Company, furnished steel for the construction of the courthouse. Plaintiff sued the general contractor and its surety. No service of process was had on the general contractor and the case proceeded against the surety company. The contractor purchased a quantity of reinforcing steel from the Nolan Company and understood that payment was to be made to that company. The bills were rendered by the Nolan Company to the contractor and were paid to the Nolan Company without notice to the contractor that any other parties were interested therein. The Nolan Company ordered the steel from the plaintiff which was shipped directly to the contractor by the plaintiff. Plaintiff knew the contractor was paying the Nolan Company who had no knowledge of plaintiff's interest. The court held the failure of plaintiff to give notice of its interest precluded it from collecting payment a second time from the contractor. The case was correctly decided, but is distinguishable and inapplicable here.

The Nebraska Chapter, Associated General Contractors of America, Inc., have filed a brief amicus curiae, asserting that section 52-118, R. S. Supp., 1965, and sections 52-118.01 and 52-118.02, R. R. S. 1943, are patterned after Title 40 U. S. C. A., §§ 270a to 270e, known as the Miller Act, and that we should follow the federal courts' construction of that act which is asserted to be consistent

with the defendant's position in the case before us. The issue involves the interpretation to be given to the proviso in section 52-118.01, R. R. S. 1943, which is the same for all practical purposes as the proviso contained in Title 40 U. S. C. A., § 270b. Such provision in the state statute provides in part: "Provided, that any person having direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing such bond shall have a right of action upon the bond upon giving written notice to the contractor within four months from the date on which such person did or performed the last of the labor, or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed."

In MacEvoy Co. v. United States, 322 U. S. 102, 64 S. Ct. 890, 88 L. Ed. 1163, it is said: "The proviso of § 2(a), which has no counterpart in the Heard Act, makes clear that the right to bring suit on a payment bond is limited to (1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and subcontractors who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor. To allow those in more remote relationships to recover on the bond would be contrary to the clear language of the proviso and to the expressed will of the framers of the Act. * * * The ultimate question in this case, therefore, is whether Miller, the materialman to whom Tomkins sold the goods and who in turn supplied them to MacEvoy, was a subcontractor within the meaning of the proviso. If he was, Tomkins' direct contractual relationship with him enables Tomkins to recover on MacEvoy's payment bond. If Miller was not a subcontractor, Tomkins stands in too

remote a relationship to secure the benefits of the bond."

Without committing ourselves on other factors, we meet the issue by a determination as to whether or not Calcavechia was a subcontractor. We point out that Calcavechia had a written contract with Blacktop to deliver about 33,424 cubic yards of gravel at the site of the project for the sum of $92,708.50. We think this contract for the delivery of gravel in such a quantity and for such a price for material so essential to the construction of a highway makes Calcavechia a subcontractor under the federal court decisions on that issue.

In Aetna Casualty & Surety Co. v. United States (1967), 382 F. 2d 615, the court said: "As we read MacEvoy, in a borderline case the distinction between a 'subcontractor' and 'materialman' turns on the substantiality and importance of the relationship between the middle party and the prime contractor. If a middle party has taken responsibility for a large and definable part of the construction project, he is a 'subcontractor'; otherwise he is a 'materialman'. * * * Courts have found, however, that a delegation of responsibility may be sufficient to render a middle party a 'subcontractor' when the middle party fabricated a complex installation, of relatively great importance in relation to the entire project. The classification held true even though the middle party did not install his product or do any on-site work. In United States v. MSI Corp., 2 Cir. 1965, 350 F. 2d 285, for example, the middle party's contract was to furnish 'a hydraulic system for opening and closing massive missile launcher roofs'. Id. at 286. And in United States v. Monaco & Son, D. Md. 1963, 222 F. Supp. 175, the court classified as a 'subcontractor' one who had agreed to furnish all the materials necessary to complete a heat distribution system. * * * The most important factor is the nature of the items Rogers supplied. None was a complex, integrated system. The most complex items were prefabricated stairs and ladders. Most of the items were such things as trench covers and

frames; hand, guard, and wall rails; pipe sleeves; door lintels; soffit frames; floor expansion joint covers; and frames for fire extinguisher cabinet recesses. Both the variety and the relative simplicity of the items supplied weigh heavily against finding that Rogers took over a significant and definable part of the construction project."

We think that Calcavechia was a subcontractor. He not only contracted to furnish gravel in a large quantity, but he contracted to furnish it on a daily basis to keep the project moving. It was a daily necessity under the prime contract and, as such, was furnished in prosecution of the work provided for in the prime contract. Under such circumstances, whether or not Calcavechia is a subcontractor is a question of fact under all the circumstances. The delivery of gravel, under the circumstances shown, was an assumption of a specific part of the material requirements of the prime contractor. Under the meaning of the applicable statutes, a subcontractor is defined generally as follows: A subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, giving consideration to the substantiality and importance of the relationship between the prime contractor and the alleged subcontractor, the relative importance of the work and materials to the prime contract, and the nature of the materials supplied as an integral part of the project.

Section 52-118, R. S. Supp., 1965, and sections 52-118.01 and 52-118.02, R. R. S. 1943, are highly remedial in their nature. They should be given a liberal construction and application in order to give effect to the intention of the Legislature to protect those whose labor and materials become a part of public projects. Whether or not a plaintiff is dealing with a subcontractor or a materialman, as those terms are used in the act, involves a question of fact. The trial court found under the evidence that Calcavechia was a subcontractor. The judgment of the

trial court has the effect of a jury verdict. We cannot say that the judgment was clearly wrong. Under this finding of fact, plaintiff is entitled to recover on Blacktop's payment bond. The costs, including an attorney's fee of $750 for services rendered in this court, are taxed to the defendant.

AFFIRMED.