*Donna Kemp v. Seterus Inc., et al.*, No. 2652, September Term 2018.
Opinion by Nazarian, J.

**BANKING – MORTGAGE LENDING – ASSESSMENT OF FEES**

Section 12-121 of the Commercial Law Article, which prohibits a "lender" from imposing a property inspection fee "in connection with a loan secured by residential property," applies to assignees of the loan and servicers as well as the original maker of the loan and prohibits them from charging property inspection fees to borrowers.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2652

September Term, 2018

_____

DONNA KEMP

v.

NATIONSTAR MORTGAGE ASSOCIATION
D/B/A MR. COOPER, AS SUCCESSOR BY
MERGER TO SETERUS, INC., ET AL.

_____

Fader, C.J.,
Nazarian,
Kenney, James A. III
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: October 1, 2020

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Donna Kemp obtained a mortgage loan from Countrywide Home Loans, Inc., ("Countrywide") that later was assigned to the Federal National Mortgage Association ("Fannie Mae"). In 2017, Ms. Kemp fell behind on her payments and the loan servicer, Seterus, Inc. ("Seterus"),[1] declared the loan in default. Ms. Kemp exchanged correspondence with Seterus and, among other things, learned that Seterus had charged her $180 for twelve property inspections that it ordered after she defaulted. In November 2017, Seterus offered (on Fannie Mae's behalf) and Ms. Kemp accepted a loan modification, and some or all of the property inspection fees were rolled into the balance of the loan.

In December 2017, Ms. Kemp filed suit against Fannie Mae and Seterus on behalf of herself and a class. She alleged that Section 12-121 of the Commercial Law Article ("CL"),[2] which prohibits a "lender" from imposing a property inspection fee "in connection with a loan secured by residential property," barred Seterus from charging property inspection fees. The Second Amended Complaint (the "Complaint") asserts five state law counts, all derived to one degree or another from Seterus's alleged violation of CL § 12-121: (1) a claim for statutory damages under CL § 12-114; (2) a claim for declaratory judgment and injunctive relief; (3) a common law claim for unjust enrichment;

---

[1] Fannie Mae and Nationstar Mortgage LLC d/b/a Mr. Cooper ("Nationstar") are the current named appellees in this case. Seterus merged with, and into, Nationstar effective February 28, 2019. Ms. Kemp's allegations relate to actions taken by Seterus before the merger. In June 2019, Nationstar was substituted by Seterus as a party, and the briefs were filed thereafter. Accordingly, we use "Seterus" when referring to the actions underlying Ms. Kemp's allegations and "Nationstar" when we discuss the arguments made by the parties in their briefs.

[2] Unless otherwise indicated, all citations are to the current volume of the Commercial Law Article, Md. Code (1975, 2013 Repl. Vol., 2019 Supp.).

(4) violations of the Maryland Consumer Debt Collection Practices Act ("MCDCA"), CL §§ 14-201 *et seq.*, and a derivative claim under the Maryland Consumer Protection Act ("MCPA"), CL § 13-301(14); and (5) a claim based on violations of the Maryland Mortgage Fraud Protection Act ("MMFPA"), §§ 7-401 *et seq* of the Real Property Article ("RP").

At all relevant times, the applicable statute defined a "lender" as a person who "makes" loans. Md. Code (1975, 2013 Repl. Vol.), CL § 12-101(f). Fannie Mae and Seterus moved to dismiss, contending that they aren't "lenders" and that CL § 12-121 doesn't preclude *them* from charging inspection fees. The circuit court agreed and dismissed the Complaint primarily on that ground. We agree with Ms. Kemp that Fannie Mae and Seterus's construction would defeat the broader statutory purpose and lead to absurd results, and we hold that CL § 12-121 applies to assignees. In addition, we (1) hold that the circuit court erred in finding that Seterus waived or paid the property inspection fees in the course of modifying Ms. Kemp's loan; (2) affirm the dismissal of the MCDCA and derivative MCPA claims; (3) hold that Ms. Kemp did not preserve her argument that the Complaint supports a standalone MCPA claim; and (4) hold that Ms. Kemp waived her challenge to the circuit court's conclusion that the Complaint failed to state her MMFPA claim with particularity. All told, we reverse in part, affirm in part, and remand to the circuit court for further proceedings consistent with this opinion.

## I.    BACKGROUND

Because this case was decided on a motion to dismiss, we take the well-pleaded allegations as true for purposes of our analysis, and we recount them here as alleged.

2

When Ms. Kemp bought her home in Glen Burnie in April 2007, she obtained a loan from Countrywide. At some point after closing, the loan was assigned to Fannie Mae. Fannie Mae conducts its business by "routinely acquir[ing] loans from others who extend on its behalf and in accordance with its guidelines" and "publish[ing] forms, guidelines, and more for persons to use when arranging sales of loans to Fannie Mae . . . ." The Deed of Trust she signed was "the standard and uniform Fannie Mae Deed of Trust . . . ."

In 2017, Ms. Kemp fell behind on her payments. Seterus, which serviced the loan on behalf of Fannie Mae at all relevant times, declared the loan in default in April of that year. Ms. Kemp wrote to Seterus on or about July 14, 2017 and asked for more information about her loan. Seterus responded on or about July 24, 2017 and, among other things, informed her that "property preservation charges" had been assessed between August 26, 2016 and July 24, 2017. In another letter dated July 20, 2017, Seterus offered Ms. Kemp a trial plan for a loan modification that required Ms. Kemp to make three payments on September 1, October 1, and November 1. Ms. Kemp accepted the trial plan and made those payments.

Ms. Kemp wrote to Seterus again on September 6, 2017 requesting additional information, including information about the property preservation charges. In a September 25, 2017 letter, Seterus represented that she owed $180 in property inspection fees that would be included as part of a "'payoff total.'" In a September 26, 2017 letter, Seterus again represented that it had charged Ms. Kemp $180 for twelve property inspections conducted after Ms. Kemp's default. Seterus averred that the inspections were "drive-by Inspections to see if the property was occupied and in good repair" and were authorized by

3

the Deed of Trust, which states that the lender may charge fees to the borrower for services including "property inspection" "performed in connection with" the borrower's default. The Deed of Trust also prohibits the lender from charging fees prohibited by law:

> **Lender may charge Borrower fees for services performed in connection with Borrower's default**, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, **property inspection** and valuation **fees**. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. **Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.**

(emphasis added).

In November 2017, Seterus, on behalf of Fannie Mae, offered Ms. Kemp a loan modification. She accepted the offer and made the modified mortgage payments. She alleges that the property inspection fees were added to the loan balance; she has paid some of the property inspection fees to Seterus through her payments during the trial period and after the loan modification but hasn't paid them in full because they were capitalized to her mortgage account, and the loan is not yet paid off.

In December 2017, Ms. Kemp filed this putative class action, which included a claim under the federal Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq*. The defendants removed the case to the United States District Court for the District of Maryland. In June 2018, the U.S. District Court granted the defendants' motion to dismiss the federal claim and remanded the action to state court.

In July 2018, the defendants moved to dismiss the remaining claims, and the circuit

4

court heard oral argument on September 13, 2018. The court granted the defendants' motion to dismiss with prejudice in a memorandum opinion and order dated October 12, 2018. Ms. Kemp appealed. The issues are altogether legal, and we'll address them and any additional facts below.

## II.    DISCUSSION

Ms. Kemp raises three Questions Presented, but they all boil down to whether the circuit court erred in dismissing the case.[3] The operative Complaint contained five counts

---

[3] Ms. Kemp states the Questions Presented as follows:

> 1. Did the circuit court err in dismissing the action in contradiction to the precedent of *Taylor* and the persuasive authority of the CPD and OCFR?
>
> 2. Did the circuit court err in concluding that a mortgage assignee acquires greater rights in mortgage contracts than their assignor had to give them?
>
> 3. Did the circuit court err in making an unsupported finding of fact at the motion to dismiss stage?

Seterus states the Questions Presented as follows:

> 1. Whether the Circuit Court properly found that MCL 12-121 did not apply to Seterus and Fannie Mae, when that statute only applies to "lenders," as defined by MCL 12-101(f), and neither Seterus nor Fannie Mae were "lenders" under the statutory definition?
>
> 2. Whether the Circuit Court properly dismissed the Second Amended Complaint with prejudice because Kemp failed to state a valid claim for relief against Seterus or Fannie Mae?
>
> 3. Whether Nationstar, as successor by merger to Seterus, is judicially estopped from arguing that the Circuit Court properly found that Seterus was not subject to MCL 12-121, because Nationstar did not dispute its status as a "lender" who was subject to MCL 12-121 when it reached a settlement with the CPD in May 2018, when Seterus did not merge with Nationstar until February 2019, over four months after the

asserting state law claims, all of which depend on whether the prohibition in CL § 12-121 against property inspection fees applies to Seterus (a loan servicer) or Fannie Mae (the assignee of the mortgage):

- A claim against Fannie Mae and Seterus under CL § 12-121, on behalf of Ms. Kemp individually and a class, including a request for statutory damages under CL § 12-114(b), which provides for the forfeiture of the greater of three times the amount collected or $500 (Count IV);

- A request for declaratory judgment that, under CL § 12-121, Fannie Mae and Seterus "are not entitled to charge and/or collect lender's inspection fees in connection with the loans of the State Law Class members and [Ms. Kemp] which are secured by residential real property," including a request that Fannie Mae and Seterus be enjoined from doing so and a request that Seterus "disgorge all inspection costs and fees it has collected" from Ms. Kemp or the class members (Count I);

- An unjust enrichment claim against Seterus alleging that Seterus "knowingly and willfully" demanded and received benefits in the form of property inspection fees that were prohibited by CL § 12-121 (Count II);

- A claim against Seterus for violation of the Maryland Consumer Debt Collection Practices Act, CL §§ 14-201 *et seq.* ("MCDCA") and a derivative claim under the Maryland Consumer Protection Act, CL §§ 13-301 *et seq.* ("MCPA"), based on Seterus's communications and correspondence with Ms. Kemp and class members in attempting to collect lender's inspection fees that were prohibited by CL § 12-121 (Count III); and

- A claim against Seterus under the Maryland Mortgage Fraud Protection Act (Md. Code, §§ 7-401 *et seq.* of the Real Property Article ("RP")) ("MMFPA") based on Seterus's assertions that property inspection fees were legal under Maryland law, when they were prohibited by CL § 12-121. (Count V).

In reviewing a circuit court's decision on a motion to dismiss, our task is to "determine whether the court was legally correct." *RRC Ne., LLC v. BAA Md., Inc.*, 413

---

Circuit Court found that Seterus was not subject to MCL 12-121, and over ten months after Nationstar's settlement with the CPD, and none of the requisite elements of judicial estoppel are present?

6

Md. 638, 644 (2010). "[W]e assume the truth of all well-pleaded facts in the complaint and reasonable inferences drawn therefrom," and we "consider those facts and inferences in the light most favorable" to the non-moving party, in this case Ms. Kemp. *Samuels v. Tschechtelin*, 135 Md. App. 483, 515 (2000); *see RRC Ne.*, 413 Md. at 643. And we "determine whether the complaint, on its face, discloses a legally sufficient cause of action." *Schisler v. State*, 177 Md. App. 731, 743 (2007) (citations omitted).

The outcome of this appeal depends in large part on the interpretation of a statute, a question of law that we review *de novo*. *Johnson v. State*, 467 Md. 362, 371 (2020). "The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *State v. Bey*, 452 Md. 255, 265 (2017) (*quoting State v. Johnson*, 415 Md. 413, 421–22 (2010)). We "provide[] judicial deference to the policy decisions enacted into law by the General Assembly," and "[w]e assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly." *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (*quoting Phillips v. State*, 451 Md. 180, 196 (2017)). To that end, "we begin 'with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology.'" *Id.* (*quoting Schreyer v. Chaplain*, 416 Md. 94, 101 (2010)). And "[a]bsent ambiguity in the text of the statute, 'it is our duty to interpret the law as written and apply its plain meaning to the facts before us.'" *Johnson*, 467 Md. at 373 (*quoting In re S.K.*, 466 Md. 31, 54 (2019)).

But we "do not read statutory language in a vacuum, nor do we confine strictly our

interpretation of a statute's plain language to the isolated section alone." *Johnson*, 467 Md. at 372 (*quoting Wash. Gas Light Co. v. Md. Pub. Serv. Comm'n*, 460 Md. 667, 685 (2018)). We view the plain language "within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute." *Johnson*, 467 Md. at 113 (*quoting State v. Johnson*, 415 Md. at 421). In other words, we read the statute as a coherent whole:

> We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

*Johnson v. State*, 467 Md. at 372 (*quoting State v. Johnson*, 415 Md. at 421–22).

In addition, "[o]ur search for legislative intent contemplates 'the consequences resulting from one construction rather than another.'" *Johnson*, 467 Md. at 372 (*quoting Blaine v. Blaine*, 336 Md. 49, 69 (1994)). We avoid interpretations that lead to illogical or absurd results, even where the legislation at issue is not necessarily identified as ambiguous. *See Goshen Run Homeowners Assoc., Inc. v. Cisneros*, 467 Md. 74, 109 (2020) ("When interpreting the language in a statute, our interpretation 'must be reasonable, not absurd, illogical, or incompatible with common sense.'") (cleaned up). And we fulfill these principles by considering and analyzing three factors:

> [I]ssue[s] of statutory construction [are] resolvable on the basis of judicial consideration of three general factors: 1) text; 2) purpose; and 3) consequences. Text is the plain language of the relevant provision, typically given its ordinary meaning, *Breslin v. Powell*, 421 Md. 266, 286 (2011), viewed in context, *Kaczorowski v. City of Baltimore*, 309 Md. 505, 514 (1987), considered in light of the whole statute, *In re Stephen K.*, 289

8

Md. 294, 298 (1981), and generally evaluated for ambiguity. *Kaczorowski*, 309 Md. at 513. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. *Kaczorowski*, 309 Md. at 515. An examination of interpretive consequences, either as a comparison of the results of each proffered construction, *Christian v. State*, 62 Md. App. 296, 303 (1985), or as a principle of avoidance of an absurd or unreasonable reading, *Kaczorowski*, 309 Md. at 513, 516, grounds the court's interpretation in reality.

*Town of Oxford v. Koste*, 204 Md. App. 578, 585–86 (2012).

## A. The Usury Statute Prohibits The Imposition Of Property Inspection Fees And Applies To Assignees.

### 1. The Usury Statute

Title 12 of the Commercial Law Article contains numerous consumer protection laws relating to loans and credit. Title 12 covers a lot of ground not relevant to this case, and we won't attempt to treat it comprehensively. By way of example, though, Subtitle 4 (CL §§ 12-401 *et seq.*), the Secondary Mortgage Loan Law ("SMLL"), defines the interest and fees that may be charged in association with a second mortgage. *Thompkins v. Mountaineer Invs, LLC*, 439 Md. 118, 123–24 (2014) ("The SMLL is a consumer protection measure that was designed to incorporate, complement, and prevent circumvention of the usury laws by limiting the interest, fees, and other charges that a lender could collect from a borrower as part of a second mortgage loan on a residential property."). Subtitle 3 (CL §§ 12-301 *et seq.*), the Maryland Consumer Loan Law ("MCLL"), governs small consumer loans and is "part of a statutory scheme that, like the SMLL, governs licensing, the amount of a loan, misleading advertising, discrimination, maximum interest rates, permissible fees, attorney's fees, and lender's disclosure

9

duties . . . ." *Price v. Murdy*, 462 Md. 145, 156 (2018). Other Subtitles cover small loans (Subtitle 2), retail credit accounts (Subtitle 5), credit grantor revolving credit provisions (Subtitle 9), and credit grantor closed end credit provisions (Subtitle 10).

The part relevant to this case is Subtitle 1, which we'll call the "Usury Statute." Its core provision limits, with some exceptions, the maximum allowable interest rate to six percent per year:

> Except as otherwise provided by law, a person may not charge interest in excess of an effective rate of simple interest of 6 percent per annum on the unpaid principal balance of a loan.

CL § 12-102. That provision was codified as part of the Commercial Law Article in 1975, without any substantive change from the first clause of former Art. 49 § 3 (1975 Md. Laws 380–81), and it has not been amended since. Exceptions to CL § 12-102's six percent maximum rate are set forth in CL § 12-103 and have been amended numerous times over the years. For example, subsection (b) applies to residential mortgages, which at the time that section was codified in 1975, could not exceed 10%. 1975 Md. Laws 382. The current version of CL § 12-103(b) has no maximum allowable rate for residential mortgages so long as certain conditions are met.

Subtitle 1 contains other restrictions beyond limits on interest rates:

- CL § 12-108 provides that a "lender"[4] may not charge a borrower a point or

_____

[4] At all times relevant to this case, and as we'll explain in greater detail below, "lender" was defined in the general definitions for Subtitle 1 simply as "a person who makes a loan subject to this subtitle." Md. Code (1975, 2013 Repl. Vol.), CL § 12-101(f). As of January 1, 2019, a "[l]ender" is "a licensee or a person who makes a loan under this subtitle." CL § 12-101(f); 2018 Md. Laws 346, 4065–66. A "licensee" is "a person that is required to be licensed to make loans subject to [Subtitle 1], regardless of whether the person is actually licensed. CL § 12-101(g).

10

a fraction of a point, with some exceptions.

- CL § 12-109 requires a "lending institution"[5] that "creates or is the assignee of" an escrow account for certain first mortgages to pay interest to the borrower on the funds in the escrow account.

- CL § 12-109.2 prohibits a "lender and an assignee of a lender" from collecting "a collection fee or service charge on the maintenance of an escrow account on a first mortgage." CL § 12-109.2(a)(3).

- CL § 12-113 prohibits a "lender" from refusing to lend money to any person solely because of "[g]eographic area or neighborhood" or "[r]ace, creed, color, age, sex, marital status, handicap, or national origin."

- CL § 12-124(2) and (3) prohibit a "lender" from requiring a borrower, "as a condition to receiving or maintaining a loan" secured by a first mortgage, to purchase property and flood insurance coverage against risks to improvements in an amount that would exceed the replacement cost of the improvements.

- CL § 12-125 requires a "lender[6] who offers to make or procure a loan secured by" certain first mortgages to provide the borrower with a financing agreement.

- CL § 12-126 allows a borrower to prepay all or part of a mortgage on the borrower's primary residence, unless otherwise provided in the loan contract. CL § 12-126(a), (b). It further requires the "lender" to refund the borrower the unearned portion of the precomputed interest charge. CL § 12-126(c).

Subtitle 1 also includes the limitation at issue in this case, CL § 12-121, which prohibits (with exceptions not applicable here) a "lender" from imposing an inspection fee "in connection with" a residential mortgage:

> (a) In this section, the term "lender's inspection fee" means a fee imposed by a lender to pay for a visual inspection of real property.

---

[5] "Lending institution" is defined in CL § 12-109(a)(3) as "a bank, savings bank, or savings and loan association doing business in Maryland."

[6] For the purposes of CL § 12-125 only, "lender" is defined as "a person subject to the licensing requirements of Title 11, Subtitle 5 of the Financial Institutions Article" and "does not include a person exempt from licensure under § 11-502 of the Financial Institutions Article." CL § 12-125(a)(5)(i), (ii).

11

(b) Except as provided in subsection (c) of this section, a lender may not impose a lender's inspection fee in connection with a loan secured by residential real property.

(c) A lender's inspection fee may be charged if the inspection is needed to ascertain completion of:

    (1) Construction of a new home; or

    (2) Repairs, alterations, or other work required by the lender.

(d) This section does not apply to an appraisal of the value of real property by a lender or to fees imposed in connection with an appraisal.

Finally, Subtitle 1 provides for both civil and criminal enforcement. Although there is no express authorization for civil claims, CL § 12-111(b) does establish a statute of limitations for a private action for "usury" at six months after the loan is satisfied:

A private action for usury under this subtitle may not be brought more than 6 months after the loan is satisfied.

"Usury" is defined broadly as charging an amount in "interest" greater than what Subtitle 1 permits:

"Usury" means the charging of interest by a lender in an amount which is greater than that allowed by this subtitle.

CL § 12-101(m). And "interest" likewise is broadly defined as including not only the interest charged on a loan, but also other fees and charges:

"Interest" means, except as specifically provided in § 12-105 of this subtitle, any compensation directly or indirectly imposed by a lender for the extension of credit for the use or forebearance of money, including any loan fee, origination fee, service and carrying charge, investigator's fee, time-price differential, and any amount payable as a discount or point or otherwise payable for services.

CL § 12-101(e).

Subsection (b) of CL § 12-112 impliedly allows a private claim against assignees, endorsees, or transferees who receive the debt with notice of usury, insofar as it *prohibits* a civil claim or plea of usury against assignees, endorsees, or transferees of a debt if they received the debt instrument *without* notice of usury in the instrument's creation or assignment:

> A claim or plea of usury is not available against a legal or equitable assignee, endorsee, or transferee of any bond, draft, mortgage, deed of trust, security agreement, promissory note, or other instrument or evidence of indebtedness, if he receives it for a bona fide and legal consideration without notice of any usury in its creation or subsequent assignment.

The prohibition of such a claim implies the availability of a civil remedy for usury against an assignee, endorsee, or transferee who receives the debt instrument *with* notice. *Thompkins*, 439 Md. at 132 n.12.

Also, CL § 12-114 references both civil and criminal enforcement. Subsection (b)(1), the source of Ms. Kemp's statutory damages claim,[7] provides a monetary remedy to borrowers when the usury statute has been violated:

> (b)(1) Any person who violates the usury provisions of this subtitle shall forfeit to the borrower the greater of:
>> (i) Three times the amount of interest and charges collected

---

[7] In addition to challenging the applicability of CL § 12-121, Fannie Mae and Nationstar argue that these claims should fail because "no private right of action exists for a violation of that statute." They argue that a private right of action is only permitted based on violations of Subtitle 1's "usury provisions" and that CL § 12-121 is not a usury provision. We disagree. As we explained above, Subtitle 1 defines "usury" as the charging of "interest," which, in turn, is broadly defined as including "any loan fee" that includes, by its plain terms, CL § 12-121's property inspection fees. CL § 12-101(e). Accordingly, contrary to Nationstar and Fannie Mae's position, CL § 12-114's monetary remedy for violations of the "usury provisions" apply to violations of CL § 12-121.

in excess of the interest and charges authorized by this subtitle; or

(ii) The sum of $500.

Finally, CL § 12-114(c) classifies the violation of CL § 12-106's disclosure provisions as a misdemeanor, and CL § 12-122 makes a knowing and willful violation of certain provisions—including the one at issue here (CL § 12-121)—a misdemeanor.

### 2. Analysis

The circuit court dismissed Ms. Kemp's claims in large part based on its conclusion that neither Fannie Mae (the assignee) nor Seterus (the mortgage servicer and Fannie Mae's alleged agent) could be liable under CL § 12-121 because neither qualified as a "lender." As noted above, and at all times relevant to this case, CL § 12-101(f) defined "lender" in the general definitions section of Subtitle 1 as "a person who makes a loan subject to this subtitle." Fannie Mae and Seterus argued before the circuit court, and they argue here, that CL § 12-121 prohibits a "lender" from imposing a "lender's inspection fee and that they are not "lenders" because they do not "make" loans. Therefore, their reasoning goes: although CL § 12-121 would prohibit the original lender from charging inspection fees, CL § 12-121 does not prohibit them from charging inspection fees. The circuit court agreed with their reasoning:

> Ordinarily, in drafting statutes, when the General Assembly uses the word "means" "the definition is intended to be exhaustive." *Hackley v. State*, 389 Md. 387, 393 (2005). By contrast, when the General Assembly uses the term "includes" in a statute, the term generally is intended to be illustrative and not a limitation. *Tribbitt v. State*, 403 Md. 638, 647–48 (2008). In this case, the meaning of the statute is plain; only "persons" [] which make loans to "borrowers" [] are lenders and thus covered by the statute.

14

> Nowhere in the second amended complaint does Kemp allege that either Seterus or Fannie [Mae] "makes loans," or that Kemp borrowed money from either defendant. According to Kemp, "as the assignee of the maker of the loans" to Kemp and the other putative class members, "Fannie Mae is now the lender and the maker of the loans, and Seterus is authorized to act as its agent." []

> The problem with the plaintiff's theory of the case, however, is that the facts alleged, even if true, do not fit the applicable statute under which she has sued. Kemp does not allege that either Seterus or Fannie Mae made any of the loans in question[], or even makes any loans in general, within the meaning of Section 12-101. Fannie Mae bought Kemp's loan in the secondary market from the financial institution which made her the loan, Countrywide Mortgage. Just as alchemy cannot transform lead into gold, Fannie Mae's purchase of Kemp's loan from Countrywide does not make Fannie Mae a lender under the statute.

Although we may be the first to do so,[8] we disagree with that reading of the statute. We begin with its plain language, *Blackstone*, 461 Md. at 113, and we read that language "within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute." *Johnson*, 467 Md. at 113 (*quoting State v. Johnson*, 415 Md. at 421). And we avoid an interpretation that has illogical or absurd results, even where the legislation at issue is not necessarily identified as ambiguous. *See Goshen Run*, 467 Md. at 109. In this instance, we conclude that the General

---

[8] As Seterus points out, several recent federal district court decisions have reached the same conclusion as the circuit court based on similar reasoning. *Suazo v. U.S. Bank Trust, NA*, 2019 WL 4673450 at *10 (D. Md. Sept. 25, 2019); *Robinson v. Fae Servicing, LLC*, 2019 WL 4735431 at *8–*9 (D. Md. Sept. 27, 2019); *Roos v. Seterus, Inc.*, 2019 WL 4750418 at *5 (D. Md. Sept. 30, 2019). Since the parties filed their briefs, another federal district court decision has followed suit. *Flournoy v. Rushmore Loan Servs., LLC*, 2020 WL 1285504 at *5–*7 (D. Md. Mar. 17, 2020). That said, this is the first Maryland appellate decision addressing this question of Maryland statutory interpretation.

Assembly did not intend for CL § 12-121's broad prohibition against property inspection fees to apply only to the originator of the loan and, even more to the point, to allow assignees of the loan or their agents to charge the very fees the originators cannot.

We get to this conclusion *first* by examining the plain language of the statute. "Lender" is defined, at all relevant times, as "a person who makes a loan subject to this subtitle." At first glance, it appears that the legislative intent was to limit "lenders" to those entities who originate loans. But the legislative history and Court of Appeals's case law indicate otherwise.

We look *second* at the history of the statute's definition of the term "lender." As we observe above, the Commercial Law Article was codified in 1975.[9] The interest and usury laws had previously been codified at 1957 Md. Code, Art. 49 (1972 Repl. Vol., 1974 Supp.). Article 49 did not define "lender" or "borrower." Md. Code (1957, 1972 Repl. Vol., 1974 Supp.), Art. 49. The definitions of those terms were added as part of the Usury Statute's recodification. "Lender" was defined as "a person who makes a loan subject to this Subtitle." 1975 Md. Laws 378. And "borrower" was defined simply as "a person who borrows money under this Subtitle." 1975 Md. Laws 376. The Revisor's Notes for both terms state that the definition of "lender" was "new" language added to indicate that the terms relate only to a person that lends (or borrows) money under Subtitle 1, as opposed to under another subtitle or law:

---

[9] Section 12-121 was enacted in 1986, eleven years after the Commercial Law Article was codified and the definitions of "lender" and "borrower" were enacted. 1986 Md. Laws 2207–08.

> Revisor's Note: This subsection is new language added to indicate that, in this subtitle, the term ["lender"] ["borrower"] relates only to a person who lends money under the provisions of this subtitle and not, for example, under any other credit law.

1975 Md. Laws 376, 378. This reveals that the purpose of adding the definition of "lender" (and "borrower") was not to differentiate between persons who "make" loans and those who do not, or persons who "borrow" money and those who do not. Instead, it was to differentiate between loans made under Subtitle 1 and those that were not. The focus was on the types of loans, not the actors making them. Indeed, when the statute does address the actors involved in credit transactions, it supports the conclusion that the legislature intended the statute to have a broad reach. For example, the term "person" is also defined and includes a broad range of actors:

> "Person" includes an individual, corporation, business trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity.

1975 Md. Laws 378.

*Third*, the Maryland case law supports our conclusion that CL § 12-121 is not limited to the originators of loans. In *Taylor v. Friedman*, the only Maryland case to interpret CL § 12-121, the Court of Appeals examined the legislative history of CL § 12-121 and held that the prohibition against lenders charging inspection fees was not limited to fees assessed as part of closing costs. 344 Md. 572, 583–84 (1997). Although the Court did not address squarely whether CL § 12-121 applied to assignees of the loan, the parties involved were the assignees, not the originators, of the loan at issue. The question of whether those parties fell within the definition of "lender" was not raised, and the Court

17

did not consider it. Instead, the Court assumed, without discussion, that CL § 12-121 did apply to the assignee and holder of the note, which was indisputably not the originator of the loan. The Court also assumed, without discussion, that Larry G. Taylor, who was not the original borrower but was instead a grantee, could bring a claim under CL § 12-121. The precise question presented, as stated by the Court, was whether CL § 12-121 "prohibits a mortgagee from charging the mortgagor fees for post-default, visual inspections of the mortgaged residence's exterior that are made to ascertain the condition of the security." *Id.* at 574. The "mortgagor" referenced was Mr. Taylor, who, in acquiring the property at issue, assumed the grantor's obligations under the deed of trust. *Id.* at 574. The "mortgagees" referenced were assignees of the note. The Court referred to the various assignees as "Lender" throughout its analysis.[10]

Mr. Taylor had, from time to time, been delinquent in making monthly payments on the note, and when a delinquency had continued for more than forty-five days from the due date, the Lender had assessed a $10.00 inspection fee to his account for inspections conducted by a third party. *Id.* at 575. The Lender eventually instituted a foreclosure action,

---

[10] The Court described the mortgagees as follows:

> The respondents are substitute trustees under the deed of trust who were designated by Margaretten & Company, Inc., the holder of the note secured by the deed of trust when the foreclosure was instituted. Margaretten & Company, Inc. subsequently was acquired by Bank of America, F.S.B. and renamed BA Mortgage, a division of Bank of America, F.S.B. We shall refer to the entity that held the note at any given time as "Lender."

*Taylor*, 344 Md. at 574–75.

and Mr. Taylor intervened and filed a counterclaim asserting that the Lender had breached the loan contract by unlawfully assessing inspection fees in violation of CL § 12-121. Mr. Taylor paid off the balance of the loan, and the case proceeded to trial on the counterclaim. The circuit court limited CL § 12-121's prohibition to inspection fees charged as part of closing costs. *Id.* at 577. Mr. Taylor appealed, and this Court affirmed. *Id.* at 578.

The Court of Appeals reversed, holding that the plain language of the statute—which prohibits property inspection fees "in connection with a loan secured by residential real property"—prohibited the Lender (again, an assignee) from assessing inspection fees to Mr. Taylor in connection with his default. *Id.* at 574, 581. The Court relied on the rule of statutory construction that where a statute expresses a general rule followed by one or more specific exceptions, "a court ordinarily cannot add to the list of exceptions." *Id.* at 581 (*citing Gable v. Colonial Ins. Co.*, 313 Md. 701, 704 (1988); *Schmidt v. Beneficial Fin. Co.*, 285 Md. 148, 155 (1979)). Although the Court did not discuss its statutory construction in great depth, its reasoning viewed CL § 12-121 as expressing a general rule that property inspection fees may not be assessed. Two exceptions are listed: those related to construction of a new home and those related to repairs, alterations, or other work required by the lender. But because there is no exception that would allow property inspection fees assessed in association with a mortgagor's default, the Court found no authority to add such an exception to the list.

The Court reinforced its interpretation of the statute by examining the legislative history of CL § 12-121. Relying on the principle that "[e]ven where the language of a statute is plain and unambiguous, [the Court] may look elsewhere to divine legislative

intent; the plain meaning rule is not rigid and does not require [the Court] to read legislative provisions in rote fashion and in isolation." *Taylor*, 344 Md. at 582 (*quoting Blaine*, 336 Md. at 64). The Court concluded that it was *not* the intent of the General Assembly to limit the applicability of CL § 12-121 solely to inspection fees charged at closing. *Id.*

In reaching its conclusion, the Court acknowledged that the background for the enactment of CL § 12-121 in 1986 was indeed a "concern over real property closing costs." *Id.* at 582. It explained how its enactment had been initiated by the January 1986 Report of the Task Force on Real Property Closing Costs requested by Governor Harry R. Hughes. *Id.* at 579. The Court observed that there was "no question" that the Task Force had been created out of concerns about real property closing costs. *Id.* at 582. But the Report's recommendations went beyond closing costs, and the Court highlighted, as an example, the enactment of CL § 12-109.2 as "a prohibition against a Lender's imposing 'a collection fee or service charge on the maintenance of an escrow account on a first mortgage or first deed of trust.'" *Id.* It described that prohibition as "continuing" and lasting "throughout the life of the loan," and it reinforced the conclusion that CL § 12-121's prohibition is not limited to fees associated with closing costs.[11] *Id.*

---

[11] What the Court did not observe was that unlike CL § 12-121, § 12-109.2 expressly provided that an "assignee of the lender" *was* prohibited from imposing service fees on escrow accounts:

> 12-109.2(b) A lender, or the assignee of the lender, may not impose a collection fee or service charge on the maintenance of an escrow account on a first mortgage or a first deed of trust.

1986 Md. Laws 2206. The current version of CL § 12-109.2, as amended, continues to include "assignees" of lenders within its ambit:

> 12-109(a)(1) "Lender" includes a lender and assignee of a

The Court went on to compare the Task Force's recommended text of CL § 12-121 with the text the General Assembly ultimately enacted, which struck the Task Force's recommended phrase "*as a condition of the loan*" from one of the exceptions to the prohibition against inspection fees. *Taylor*, 344 Md. at 583. In the Court's view, that omission reinforced its reading of CL § 12-121's plain meaning, *i.e.*, that the prohibition against property inspection fees is not limited to fees assessed at closing:

> [P]roposed § 12-121(c)(2), as introduced, would have permitted a fee for a lender's inspection to ascertain completion of "repairs, alterations or other work required by the lender *as a condition to granting the loan*." 1986 Md. Laws at 2208 (emphasis added). The italicized language indicates that the Commission's focus may well have been on inspection fees associated with a loan closing. But the General Assembly

lender.

CL §§ 12-121 and 12-109.2 were enacted at the same time. 1986 Md. Laws 2205–08. An argument could be made that the General Assembly could have extended the definition of "lender" to include "assignees" in CL § 12-121, just as it did in CL § 12-109.2, and chose not to do so. Fannie Mae and Nationstar do not make that argument, although they do offer a similar argument based on a different statute: they argue that, had the General Assembly intended CL § 12-121 to apply to assignees and mortgage loan servicers, it knew how to do it and could have done so, as it did when it changed the definition of "mortgage lender" in a different title to include "any person who: (i) [i]s a mortgage broker; (ii) [m]akes a mortgage loan to any person; or (iii) [i]s a mortgage servicer." Md. Code (1980, 2020 Repl. Vol.), Fin. Inst. § 11-501(j)(1).

Although we are not convinced by Fannie Mae and Nationstar's argument—the General Assembly's amendments to a different law in 2009 is too remote to carry much weight to discern its intent with respect to CL § 12-121 in 1986—we observe nevertheless that, writing on a clean slate, we may have afforded more weight to the difference between CL §§ 12-109.2 and 12-121. But as we explain further below, we feel we are constrained by *Taylor*'s conclusion that, based on the General Assembly's removal of the phrase "*as a condition of the loan*" from CL § 12-121, the legislature intended the prohibition against property inspection fees to extend throughout the life of the loan, regardless of whether it was assigned. We also feel we are constrained by another Court of Appeals case, *Thompkins*, that we discuss below as well. *Thompkins v. Mountaineer Invs., LLC*, 439 Md. 118 (2014).

struck the italicized language from the bill in the course of passage.

The effect of this amendment was to expand the exception to the prohibition so that inspection fees could be charged for ascertaining the completion of work that had nothing to do with granting the loan. For example, in the instant matter, Taylor assumed the obligation in ¶ 5 of the deed of trust to "keep the said premises in as good order and condition as they are now . . . reasonable wear and tear excepted." If Taylor had violated that covenant, and Lender and Taylor agreed that Lender would not treat the breach as a default if Taylor caused repairs to be made within a stated time, Lender would not be prohibited from charging an inspection fee to determine if those repairs had been made. In terms of the issue before us, the amendment to the Commission's proposed statute concerning inspection fees indicates that the General Assembly did not consider that the prohibition against inspection fees was limited to closing costs. Otherwise, there would have been no need to eliminate from the exception the limitation to conditions of granting the loan. In other words, an exception for an inspection fee to determine if work had been done that was a condition of the loan would have been entirely adequate if the prohibition against inspection fees were limited to those charged as part of closing costs. It is the intent of the General Assembly that we must discern, not that of the Commission.

For the foregoing reasons we conclude that the legislative history does not so clearly demonstrate a purpose to limit the prohibition of § 12-121 to closing costs as to override the plain language of the statute. Accordingly, we shall reverse and remand for further proceedings.

*Taylor*, 344 Md. at 583–84.

Another Court of Appeals decision, *Thompkins v. Mountaineer Investments, LLC*, 439 Md. 118, 132 (2014), also supports our conclusion that CL § 12-121 reaches assignees. *Thompkins* recognized the unlikelihood that the General Assembly intended for protective provisions in (a different subtitle of) Title 12 to be defeated by assigning the loan. At issue in *Thompkins* was Subtitle 4 of Title 12, the Secondary Mortgage Loan Law. The issue was

different than it is here or in *Taylor*—the question was "whether an assignee of a second mortgage loan is responsible for certain statutory violations allegedly committed by the original lender when the loan was made." *Thompkins*, 439 Md. at 122. The Court held that it was not, "even though the assignee may be liable for any violation of the SMLL that the assignee itself commits in connection with repayment of [the] loan." *Id.* at 141. In the course of its analysis, the Court observed first that, unlike other provisions of Title 12 (including CL § 12-109.2, *see* n.11, above), "the SMLL does not include a specific reference to assignments or assignees." *Id.* at 131. Indeed, the definition of "lender" in the SMLL was recodified from Art. 66, § 40(b-1) in 1975 and hasn't changed since:

> (c) Lender.
> "Lender" means:
>> (1) a licensee; or
>> (2) a person who makes a secondary mortgage loan but is exempt from the licensing requirements of the Maryland Secondary Mortgage Loan Law – Licensing provisions.

1975 Md. Laws 436. But the Court went on to observe that even though "the SMLL does not provide that an assignee of a lender is liable for the lender's violations of that statute at the time the loan was made," *Thompkins*, 439 Md. at 131, the SMLL "is not entirely bereft of the notion that a loan may be assigned," *id.* at 132, and, therefore, an assignee could be subject to the SMLL's ongoing regulation of a loan. *Id.* at 132–33 ("It seems unlikely that the General Assembly intended that key ongoing protections of the SMLL—*e.g.*, the prohibition against a usurious interest rate—could be defeated simply by assigning the promissory note. *Cf. Brenner v. Plitt*, 182 Md. 348, 34 A.2d 853 (1943) ("no subterfuge shall be permitted to conceal [a usurious loan]") (brackets in original) (footnote omitted)).

23

Principles of statutory interpretation do not require us to apply the text of a statute rigidly where that application leads to absurd or inconsistent results. And it's inconsistent with the purpose of Subtitle 12 to allow an assignee of a note or its agents to charge fees that the originating lender cannot. We are not writing on a blank slate in this regard either— to read CL § 12-121 as Fannie Mae and Nationstar do would contradict the Court of Appeals's application of CL § 12-121 to an assignee in *Taylor*. The language of the section isn't ambiguous in isolation, but a wooden application of the term "lender" here is inconsistent with the structure and purpose of the legislation enacting it, and we decline to read CL § 12-121 in a way that defeats itself.[12] We reverse the circuit court's dismissal of Ms. Kemp's claims under CL § 12-121.

## B. Ms. Kemp's Other Arguments.

This leaves us now to decide whether the circuit court erred in dismissing Ms. Kemp's claims on other grounds or in any other respect. For the reasons we'll explain, we hold that (1) the circuit court erred insofar as it dismissed Ms. Kemp's unjust enrichment and MMFPA claims based on its finding that Seterus waived or paid the

---

[12] In light of our holding, it is not necessary for us to address the other arguments made by Ms. Kemp, including her arguments that the resolution of proceedings before the Consumer Protection Division of the Office of the Attorney General ("CPD") and the Office of the Commissioner of Financial Regulation ("OCFR") constitute persuasive authority that CL § 12-121 applies to assignees of loans; that the General Assembly is aware of how the secondary mortgage market works and knew how to exempt Fannie Mae from prohibitions or requirements related to loans or mortgages, but chose not to in CL § 12-121; that the statutory requirements of CL § 12-121 (as opposed to contractual requirements) apply to Fannie Mae because it "stepped into the shoes" of the assignor; and that Nationstar is estopped judicially from arguing that it is not subject to CL § 12-121 based on an Assurance of Discontinuance it entered with the Consumer Protection Division of the Attorney General's Office.

property inspection fees in the course of modifying Ms. Kemp's loan, but (2) the circuit court did not err in dismissing Ms. Kemp's MCDCA claim, even though its reliance on the reasoning in *Lovegrove v. Brock & Scott, PLLC*, 666 Fed. Appx. 308 (4th Cir. 2016) likely was misplaced. From there, we (3) decline to decide whether Ms. Kemp stated a standalone MCPA claim grounded in deceit, in violation of CL § 13-301(9), because she did not raise that argument in the circuit court; and (4) find that Ms. Kemp waived her right to challenge the dismissal of her MMFPA claim on the ground that it is not pled with the requisite particularity.

*First*, the circuit court erred insofar as it found, as a matter of fact, that the property inspection fees either were paid by Seterus or were waived as part of the loan modification and then, relied on that finding to dismiss Ms. Kemp's unjust enrichment and MMFPA claims.

The circuit court made three different, inconsistent statements about Seterus's waiver or payment of the property inspection fees in its memorandum opinion. In its summary of the allegations of the Complaint, the court stated that the November 2017 loan modification offer "required [Ms.] Kemp to pay the inspection fees as part of the loan balance." Then, in the context of dismissing the unjust enrichment claim, the court stated that the plain language of the loan modification agreement provided that property inspection fees were *not* added to the loan balance and that they were instead "paid by Seterus, not Kemp." Finally, in dismissing the MMFPA claim, the circuit court stated that the loan modification agreement "waived the property inspection fees."

The circuit court was correct in observing in its summary of the Complaint's

25

allegations that the loan modification agreement added the property inspection fees to the balance of the loan. The circuit court erred, however, in finding that the language of the loan modification agreement established that the property inspection fees were *not* added to the loan balance or were paid by Seterus. The plain language of the documents does not establish either proposition.[13] Although the court's memorandum opinion does not identify the provision of the loan modification agreement on which it relied, it appears from the defendants' brief in support of their motion to dismiss that the court relied on ℗ 8(e), which states that Seterus would pay "[a]ll administration and processing costs" incurred by Seterus "in connection with" the loan modification agreement. But notably, ℗ 8(e) does *not* say that Seterus would waive or pay property inspection fees:

> All administration and processing costs incurred by Servicer in connection with this Agreement, such as required notary fees, recordation fees, title costs, and property valuation fees, shall be paid by the Servicer, unless otherwise stipulated.

And just as ℗ 8(e) does not establish that property inspection fees assessed to Ms. Kemp *weren't* added to the loan balance, it also does not establish that the property inspection fees *were* added. The resolution of that fact dispute awaits discovery.[14]

---

[13] Generally, "where matters outside of the allegations in the complaint and any exhibits incorporated in it are considered by the trial court, a motion to dismiss generally will be treated as one for summary judgment." *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 175 (2015). But where, as here, an extraneous document merely supplements the allegations of the complaint, and the document is not in dispute, consideration of the document on a motion to dismiss does not convert it into one for summary judgment. *Id.* That is the case whether the complaint expressly refers to it, *Margolis v. Sandy Spring Bank*, 221 Md. App. 703, 710 n.4 (2015), or if it's appended to a defendant's motion to dismiss. *Smith v. Danielczyk*, 400 Md. 98, 205 (2007).

[14] Ms. Kemp also relies on language in the "Summary" of the loan modification agreement to support her assertion that the fees were added to the loan balance. The Summary states,

*Second*, the circuit court's reliance on *Lovegrove v. Brock & Scott, PLLC*, 666 Fed. Appx. 308 (2016) in dismissing the MCDCA claim appears to have been misplaced, but we affirm the circuit court's dismissal of Ms. Kemp's MCDCA claim on other grounds.

The MCDCA provides that "[i]n collecting or attempting to collect an alleged debt a debt collector may not" engage in certain acts or methods. CL § 14-202. "The MCDCA, and in particular § 14-202, is meant to proscribe certain *methods* of debt collection and is not a mechanism for attacking the validity of the debt itself." *Chavis v. Blibaum Assocs.*, 246 Md. App. 517, 528 (2020) (*quoting Fontell v. Hassett*, 870 F. Supp. 2d 395, 405 (2012) (emphasis in original)). The proscribed acts or methods are identified in subsections (1) through (9) of CL § 14-202. *See Fontell*, 870 F. Supp. 2d at 405 (emphases in original) ("The Act proscribes certain *conduct*, (1) through (9), by a collector in 'collecting or attempting to collect an *alleged debt* . . . .'").

Ms. Kemp alleges that Seterus engaged in two of the nine prohibited acts or methods. *First*, she alleges that Seterus "[c]laim[ed], attempt[ed], or threaten[ed] to enforce

---

among other things, that "certain assessments paid on your behalf to a third party[] will be added to your loan balance":

> NEW/UNPAID PRINCIPAL BALANCE: Any past due amounts as of the end of the trial period, including unpaid interest, real estate taxes, insurance premiums, and certain assessments paid on your behalf to a third party, will be added to your mortgage loan balance. We may waive ALL late charges that have accrued and remain unpaid at the end of the trial period if you fulfill the terms of the trial period including, but not limited to, making any remaining trial period payments.

But again, this provision does not resolve the question of whether the property inspection fees actually were added to the loan balance, a fact issue that remains unresolved.

a right with knowledge that the right does not exist" in violation of subsection (8) of CL § 14-202. *Second*, she alleges that Seterus "[used] a communication which simulates legal or judicial process or gives the appearance of being authorized, issued, or approved by a government, governmental agency, or lawyer when it is not" in violation of subsection (9) of CL § 14-202.

We need not spend long on the question of whether the circuit court erred in dismissing the MCDCA claim insofar as it was based on CL § 14-202(9) (and to the extent Ms. Kemp challenges that ruling). It didn't. Ms. Kemp's appellate brief contains only one reference that we could find to CL § 14-202(9) and no substantive argument supporting the subsection (9) part of her claim, so she has waived this argument. Md. Rule 8-504(a)(5) (requiring that an appellate brief contain "[a]rgument in support of the party's position"); *Klauenberg v. State*, 355 Md. 528, 551–52 (1999); *Beck v. Mangels*, 100 Md. App. 144, 149 (1994) ("[A]rguments not presented in a brief or not presented with particularity will not be considered on appeal.").

Even if we considered the argument on its merits, we would affirm the circuit court's dismissal of the MCDCA claim insofar as it arises under subsection (9). As the circuit court observed, Ms. Kemp's Complaint fails to identify any communication that "simulates legal or judicial process" or purports to be "authorized, issued, or approved by a government, governmental agency, or lawyer" when it wasn't. In her briefing in the circuit court, Ms. Kemp asserted that the offending "communication" at issue was the Fannie Mae Deed of Trust that Seterus filed in the land records for Anne Arundel County. And indeed, the Complaint alleges that the "filing of documents in the government's and court records

throughout the State of Maryland indicat[es] that it has a right to collect [inspection] fees." She argued that because the Deed of Trust contained a provision allowing property inspection fees, and because the Deed of Trust was filed in the land records, the Deed of Trust "gives the wrongful appearance that the government has approved the fees." The circuit court rejected that argument, holding that it "is aware of no authority, and [Ms.] Kemp has cited none," supporting the proposition that a filed deed of trust is a "communication which . . . gives the appearance of being authorized, issued, or approved" by the government or a governmental agency, as required to state a claim under CL § 14-202(9). We agree.

With respect to the CL § 14-202(8) claim, the circuit court held that it failed because Seterus was not prohibited by CL § 12-121 from assessing or collecting property inspection fees, and that therefore, its assessment of such fees was not a claim, attempt, or threat to enforce a right that does not exist. But in the alternative, the circuit court also held that, even if the property inspection fees *were* prohibited, Ms. Kemp still failed to allege an MCDCA claim because the Complaint failed to allege facts to support a finding that Seterus was collecting or attempting to collect a debt. In other words, the court implied that the MCDCA claim should be dismissed whether or not Seterus engaged in one of the prohibited debt collection methods because the Complaint failed to allege that Seterus was collecting or attempting to collect a debt in the first place. As we explain, the court focused too narrowly on whether the three letters identified in the Complaint were debt collection attempts. But as we explain further, the claim fails nevertheless.

In dismissing the MCDCA claim, the circuit court analyzed three letters identified

29

in the Complaint:

- The July 24, 2017 letter in which Seterus first informed Ms. Kemp of the "property preservation charges" that had been assessed between August 26, 2016 through July 24, 2017;

- The September 25, 2017 letter in which Seterus represented that Ms. Kemp owed $180 in property inspection fees, which were included as part of a "payoff total"; and

- The September 26, 2017 communication in which Seterus disclosed more details about those charges, namely that it had charged Ms. Kemp $180 for twelve property inspections that were conducted following Ms. Kemp's default.

Language in the footer of all three letters stated that "if you are in bankruptcy or received a bankruptcy discharge of this debt, this letter is not an attempt to collect the debt."[15]

In holding that these letters did not constitute attempts to collect a debt, the circuit court relied on the reasoning in an unpublished Fourth Circuit case, *Lovegrove v. Brock & Scott, PLLC*, 666 Fed. Appx. 308 (4th Cir. 2016). In *Lovegrove*, the Fourth Circuit affirmed

---

[15] The language in the footer of the July 24 and September 26 letters stated in relevant part:

> THIS COMMUNICATION IS FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR. WE ARE ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT. THIS NOTICE IS BEING FURNISHED FOR YOUR INFORMATION AND TO COMPLY WITH APPLICABLE LAWS AND REGULATIONS. IF YOU RECEIVE OR HAVE RECEIVED A DISCHARGE OF THIS DEBT THAT IS NOT REAFFIRMED IN A BANKRUPTCY PROCEEDING, YOU WILL NOT BE PERSONALLY RESPONSIBLE FOR THE DEBT.

the district court's summary judgment in favor of a mortgage loan servicer, holding that the servicer did not violate the Fair Credit Reporting Act (15 U.S.C. §§ 1692(a), 1692(e), 1692(f)) when it sent communications to a debtor-mortgagor with language similar to the letters at issue here: "[I]f the debt . . . has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt." *Lovegrove*, 666 Fed. Appx. at 312 (brackets and ellipsis in original). The debtor-mortgagor in *Lovegrove* had obtained a discharge of his obligation to pay the mortgage. The Fourth Circuit reasoned that "the communications were for informational purposes only, were non-threatening in nature, and contained clear and unequivocal disclaimers to establish that they were not in connection with the collection of a debt under Lovegrove's circumstances." *Id.* at 311.

The circuit court held in this case that the MCDCA claim "fails because in the three letters identified in the complaint, Seterus made it clear that if the recipient had received a bankruptcy discharge, as Kemp had, no collection was sought or intended."[16] We read the court's statement to mean that the MCDCA claim, insofar as it was based on those three letters, fails from the start because in sending those letters Seterus was not "collecting or attempting to collect an alleged debt" in the first place, as required by CL § 14-202. In other words, because the disclaimers stated that no debt collection was sought, the court didn't need to reach the question of whether the letters sought to collect the debt by a

---

[16] We assume, without deciding, that Ms. Kemp had indeed received a bankruptcy discharge. Although that fact does not appear to be in dispute, we observe that the parties did not cite, and we did not find, an allegation to that effect in the Complaint.

31

prohibited method.

As an initial matter, *Lovegrove* does not govern here because it is an unpublished opinion from a federal court. That being said, even if it did govern, we are not convinced that its reasoning applies. The MCDCA seems at least to leave open the possibility that a mortgage servicer could be liable for violating subsection (8) (or any of the other subsections of CL § 14-202) if it attempted to enforce a right it knew it did not possess (or use another prohibited method of collection) in a situation, as here, where the "debt" that the servicer was collecting or attempting to collect was payment sought in connection with a valid lien on real property from an individual whose personal liability for the loan was discharged in bankruptcy. We need not decide that question, though, because Ms. Kemp's allegations do not support a finding that Seterus used an unauthorized method in violation of CL § 14-202(8) in its attempt to collect the property inspection fees. As we observed above, the MCDCA makes a distinction between underlying "debt" that the debt collector is attempting to collect and the *methods* used to collect that debt. It is inappropriate *methods* of collection that the MCDCA targets, not the validity of the underlying debt.

In their discussion of this question in this case, the parties and the court assumed that the underlying debt was the mortgage (or the modified mortgage) and the inappropriate method was the attempt to enforce the right to collect illegal property inspection fees. But their reasoning breaks down in the second half of that sentence. An attempt to collect fees— even where they are illegal—is not a "method." Instead, Ms. Kemp seeks to attack the validity of the fees via the MCDCA, which she cannot. *Chavis*, 246 Md. App. at 529; *Allstate Lien & Recovery Corp. v. Stansbury*, 219 Md. App. 575, 591 (2014).

This conclusion is easier to understand in the context of other acts and methods that CL § 14-202 prohibits. For example, subsection (1) prohibits a debt collector from "[using] or threaten[ing] force or violence" in the collection or attempt to collect a debt. Other subsections prohibit methods such as threatening criminal prosecution (CL § 14-202(2)), communicating with a debtor "with the frequency, at the unusual hours, or in any other manner as reasonably can be expected to abuse or harass the debtor (CL § 14-202(6)), and "us[ing] obscene or grossly abusive language in communicating with the debtor or a person related to him" (CL § 14-202(7)). And Subsection 8's prohibition against "claim[ing], attempt[ing], or threaten[ing] to enforce a right with knowledge that the right doesn't exist" must be understood in terms of employing a *method* of collecting the underlying debt—not in terms of an attempt to collect a debt different than the underlying one.

Two cases decided by this Court illustrate this distinction with respect to subsection (8). Ms. Kemp relies on these cases to argue that the imposition of "unauthorized" fees can, in fact, form the basis of a CL § 14-202(8) claim, but her reliance is misplaced. In *Allstate Lien*, we held that "front-loading processing fees and including those fees" as part of a "garageman's lien" was an improper method of collecting the fees under CL § 14-202(8) because the inclusion of such fees in the garageman's lien was prohibited by statute. 219 Md. App. at 591. Similarly, in *Mills v. Galyn Manor Homeowner's Assoc., Inc.*, we held that a homeowners' association's attempt to collect past due homeowners' association fees under CL § 14-202(8) by imposing a lien was an improper method of collecting overdue association fees because the statute of limitations for filing such liens had expired. 239 Md. App. 663, 679 (2018). Importantly, though, these cases are distinguishable because the

33

validity of the fees due in both cases—or more accurately, the validity of the debt created by the past due fees—was not challenged.

The issue in *Allstate Lien* was not whether a $1,000 fee was or wasn't authorized, but whether such a fee could be added to a garageman's lien. 219 Md. App. at 591. We held that under CL § 16-202(c), such a lien "is based solely on charges incurred for repair or rebuilding, storage, or tires or other parts or accessories" and that "[t]he lien does not encompass 'cost of process' fees." *Id.* at 590–91. As such, "front-loading processing fees and including those fees as part of the lien" could be challenged under CL § 14-202(8) because the challenge related to the *method* of collecting the debt, not the debt itself.

In *Mills*, the homeowners acknowledged that they owed several months of delinquent assessment fees. 239 Md. App. at 679. They challenged, among other things, the association's right to file liens to collect fees when the statute of limitations to file such liens had expired. *Id.* We held that the circuit court erred in granting summary judgment in the homeowners' association's favor because that challenge had not related, as the circuit court had found, to the validity of the debt.

In this case, Ms. Kemp identifies no improper method of collection nor any basis on which to conclude that Seterus's capitalization of the property inspection fees into the modified loan was improper. She identifies no statute, like the one in *Allstate Lien*, that would make it improper to include appropriately charged fees in the modified mortgage. This case is more like *Chavis* (a case decided after briefing and oral argument in this case), in which we affirmed the dismissal of a CL § 14-202(8) claim where a creditor "collect[ed] filing fees associated with obtaining writs of garnishments by adding those fees to the

34

amounts it sought to collect through the garnishments." 246 Md. App. at 527. The statute on which the debtor relied "[did] not restrict the types of costs that a creditor is entitled to receive," and using wage garnishment to collect the filing fee for the writ of garnishment did not violate CL § 14-202(8). So although the circuit court's reliance on *Lovegrove* appears to have been misplaced, we affirm the dismissal of the MCDCA claim to the extent it was based on CL § 14-202(8). We likewise affirm the dismissal of the derivative claim because Ms. Kemp's Complaint fails to allege facts supporting a claim under that subsection.

*Third*, in Count III, Ms. Kemp alleges that "Seterus' actions in violation of the MCDCA also constitute a *per se* violation of the MCPA pursuant to Com. Law § 13-301(14)(iii)." Section 13-301(14)(iii) defines a violation of the MCDCA as an "unfair, abusive or deceptive trade practice[]" under the MCPA. In their motion to dismiss before the circuit court, Fannie Mae and Seterus argued that Ms. Kemp's MCPA claim should be dismissed because it is entirely derivative of the MCDCA claim, which, it argued, should be dismissed. Ms. Kemp responded that because the MCDCA claim should *not* be dismissed, neither should the MCPA claim.

But on appeal, as best we can discern, Ms. Kemp shifts gears and argues that the circuit court erred in dismissing the MCPA claim because, she contends, the facts support a standalone claim based on deceit under CL § 13-301(9). That subsection defines certain forms of deception as an "unfair, abusive or deceptive trade practice[]":

> Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer

35

rely on the same in connection with:

> (i) The promotion or sale of any consumer goods, consumer realty, or consumer service;
>
> (ii) A contract or other agreement for the evaluation, perfection, marketing, brokering or promotion of an invention; or
>
> (iii) The subsequent performance of a merchant with respect to an agreement of sale, lease, or rental.

As Fannie Mae and Nationstar point out, however, Ms. Kemp did not raise this argument in the circuit court and, therefore, she has waived it. Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court . . . ."). Because we affirmed the dismissal of the MCDCA claim *in toto*, Ms. Kemp's MCPA claim does not survive.

*Fourth*, and finally, Ms. Kemp also has waived her right to challenge the dismissal of the MMFPA claim on the ground that it is not pled with the requisite particularity. The MMFPA prohibits "mortgage fraud." Md. Code (1974, 2015 Repl. Vol.), § 7-402 of the Real Property Article ("RP") ("A person may not commit mortgage fraud."). RP § 7-401 defines "mortgage fraud" as an action made "with the intent to defraud" that involves any of six enumerated actions, including misrepresentations or omissions or receiving proceeds that resulted from making a misrepresentation or omission.[17]

---

[17] RP § 7-401 states:

> (d) "Mortgage fraud" means any action by a person made with the intent to defraud that involves:
>
> > (1) Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage

Claims sounding in fraud must be pled with particularity:

> The requirement of particularity ordinarily means that a plaintiff must identify who made what false statement, when, and in what manner (i.e., orally, in writing, etc.); why the statement is false; and why a finder of fact would have reason to conclude that the defendant acted with scienter (i.e., that the defendant either knew that the statement was false or acted with reckless disregard for its truth) and with the intention to persuade others to rely on the false statement.

*McCormick v. Medtronic, Inc.*, 219 Md. App. 485, 528 (2014); *accord Buckingham v.*

---

lender, borrower, or any other party to the mortgage lending process;

(2) Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(3) Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(4) Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1), (2), or (3) of this subsection;

(5) Conspiring to violate any of the provisions of item (1), (2), (3), or (4) of this subsection; or

(6) Filing or causing to be filed in the land records in the county where a residential real property is located, any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

*Fisher*, 223 Md. App. 82, 92 (2015).

The circuit court's primary ground for dismissing the MMFPA claim was its mistaken factual finding that Seterus waived the fees. But the circuit court also stated that Ms. Kemp failed to plead the claim with particularity:

> To be legally sufficient under the MFPA, the factual allegations must be tantamount to alleging deceit, *i.e.*, at the very least an alleged false statement of material fact made with the intent to deceive and intended to be relied on by the borrower or other party to the lending process. *In re Blackston*, 557 B.R. 858, 873 (Bkrtcy, D. Md. 2016); *see also Thomas v. Nadel*, 427 Md. 441, 450–51 & n.18 (2012) (definition of fraud under Maryland law). According to Kemp, Seterus misrepresented that it was authorized to impose property inspection fees in its July 24, 2017, September 25, 2017, and September 26, 2017 correspondence, and that Kemp relied on those misrepresentations when she accepted her Loan Modification Agreement. In other words, Kemp is claiming that Seterus committed a fraud when it modified Kemp's loan, to Kemp's benefit, and lowered her monthly payment. The problem with Kemp's argument is that the Loan Modification Agreement waived the property inspection fees. She could not, therefore, have relied on a material misrepresentation about property inspection fees because, at the end of the day, none were charged. **In short, Kemp has failed to plead, with the requisite particularity, a claim of fraud under the MMFPA**. *See Amenu-El v. Select Portfolio Services*, No. CV-RDB-177-2008, 2017 WL 4404428 at \*5 (D. Md. Oct. 4, 2017).

(emphasis added).

Ms. Kemp argues here that she did plead the MMFPA claim with particularity. But this is the extent of her argument—a reference to a footnote in another section of her brief:

> [A]s summarized in FN 14 *supra*, Kemp put the Appellees on sufficient notice of the details of her claim and there is no plausible suggestion that either Appellees [*sic*] does not know and understand the claims against them. Despite the lower

38

court's conclusory statement to [the] contrary, Kemp pled her MMFPA claim with more than enough particularity.

Footnote 14, in turn, addresses the circuit court's observation that some claims under the MCPA (*e.g.*, if based on deceit) must be pled with particularity, and that Ms. Kemp's MCPA claim fails under either the regular or heightened pleading standard. But footnote 14 doesn't explain her theory of fraud or deceit. Instead, it refers to paragraphs of the Complaint and takes issue with the circuit court's purported cursory approach to this question:

> The Circuit Court's holding in this regard is made with no analysis and belies the record it had before it. *See e.g.* E. 18-21, 24-25, 27-30, SAC at ¶¶24-26, 28, 36 (identifying dates of the illegal imposition of inspection fees), 22, 24, 28 (dates of correspondence), 34-37 (Kemp's reliance), 2, 5, 7, 9-11, 41-46 (details of Nationstar's knowledge). Respectfully, this conclusion by the Circuit Court simply demonstrates it had reached a conclusion without conducting the appropriate analysis of the record before it.

In other words, Ms. Kemp is critical of the circuit court's approach, but at the same time fails to explain how the alleged facts in her Complaint fit together to support her theory of fraud.

And as she does before us, her circuit court briefing cited to paragraph numbers of the Complaint without actually explaining the theory:

> Ms. Kemp has properly pled her MMFPA claim with particularity so that the Defendants know the details of the claim (i.e. the who, what, where, when, and why). . . .
>
> Here, Ms. Kemp has notified the Defendants of the following parts of her MMFPA claim:
>
> - The dates of the illegal imposition of property inspection fees onto Ms. Kemp's mortgage account by

Seterus. SAC at ¶¶ 24-26, 28, 36.

- The dates of the relevant, written communications where Seterus disclosed to Ms. Kemp that it had imposed the illegal property inspection fees on Ms. Kemp's mortgage account and when she became aware of the illegal charges. SAC at ¶¶ 22, 24, 28.

- The well-pled facts identifying Ms. Kemp's reliance to Seterus' illegal imposition of property inspection fees. SAC at ¶¶34-36, 37.

- Detailed facts concerning Seterus' knowledge that it has no right to impose the illegal property inspection fees but it did so anyway. SAC at ¶¶ 2, 5, 7, 9-11, 41-46.

Based on the foregoing, there simply is no merit to Seterus' conclusory allegation that Ms. Kemp has not pled her MMFPA claim with particularity. It is aware of all the key facts related to Ms. Kemp's MMFPA claim and can prepare whatever argument it[] wishes to present to the fact-finder about its illegal activities.

Although it is not our (or the circuit court's) role to reconstruct Ms. Kemp's theory of fraud, we acknowledge that the circuit court and the parties appeared to be working from the theory that in both assessing the property inspection fees and in sending her the three letters, Seterus had misrepresented to Ms. Kemp that the fees were permitted by Maryland law when in fact they weren't. From there, we assume, she claims that Seterus knowingly made those misrepresentations with the intent of inducing Ms. Kemp to agree to the trial period for the loan modification in July and to the actual loan modification in November, and that she relied reasonably on those misrepresentations when she decided to enter into the trial period and the loan modification.

But without an explanation by Ms. Kemp of how, exactly, the different elements of the theory (*e.g.*, intent to defraud, reasonable reliance) are connected to *facts* alleged in the

Complaint, it is impossible for us to evaluate her assertion that her Complaint pleads mortgage fraud with particularity. She has, therefore, waived her right to challenge the circuit court's dismissal of the MMFPA claim on appeal. Md. Rule 8-504(a)(5) (requiring that an appellate brief contain "[a]rgument in support of the party's position"); *Klauenberg*, 355 Md. at 551–52; *Beck*, 100 Md. App. at 149.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/2652s18cn.pdf